IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CARA LOESER, | CIVIL NO. 04-00474 DAE/KSC |
| Plaintiff, | MEMORANDUM IN SUPPORT OF MOTION |
| vs. | |
| ST. FRANCIS MEDICAL CENTER, | |
| Defendant. | |

## MEMORANDUM IN SUPPORT OF MOTION

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................. 1

II.  BACKGROUND FACTS........................................................ 1

A.   Plaintiff's Performance in Pharmacy Technician Position ................ 1

B.   Plaintiff's Transfer to Admissions Registrar position........................ 6

C.   Plaintiff's Performance in Admissions Registrar Position.................. 7

D.   Plaintiff's Attempts to Find New position ........................................ 13

E.   Reasonable Accommodations Requested by Plaintiff ...................... 15

F.   Alleged Friction Between Plaintiff and Coworkers .......................... 17

G.   Subsequent Inability to Maintain Employment................................. 21

III. ARGUMENT ...................................................................... 25

A.   Standard for Summary Judgment....................................................... 25

B.   Plaintiff's Disability Discrimination Claims Are Barred
     Because She is Not a "Qualified Individual." .................................... 26

C.   Plaintiff's Failure to Reasonably Accommodate Claims (Counts
     I and III) Are Barred by the Absence of Possible Reasonable
     Accommodations ................................................................................ 32

D.   Plaintiff's Hostile Environment Claim is Barred by the Failure
     to Exhaust Administrative Remedies and Absence of  Severe
     and Pervasive Conduct ...................................................................... 33

E.   Plaintiff's Retaliation Claim is Barred by the Absence of an
     Adverse Employment Action and Defendant's Legitimate
     Business Reasons................................................................................ 40

IV.  CONCLUSION.................................................................... 42

# TABLE OF AUTHORITIES

Page

## CASES

*Allen v. Pacific Bell*, 212 F.Supp.2d 1180 (C.D. Cal. 2002) ................................. 30

*B.K.B. v. Maui Police Dep't.*, 276 F.3d 1091 (9th Cir. 2002) ............................. 32

*Bass v. County of Butte*, 2004 U.S. Dist. Lexis 17191, (E.D. Ca. 2004)......... 26, 27

*Beaulieu v. Northrop Grumman Corp.*, 161 F.Supp.2d 1135 (D. Haw. 2000) .......................................................................................... 23, 24, 25

*Bradley v. Harcourt, Brace and Co.*, 104 F.3d 267, 271 (9th Cir. 1996)............... 25

*Brooks v. San Mateo*, 229 F.3d 917 (9th Cir. Cir. 2003)...................................... 37

*California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466 (9th Cir. 1987) ............................................................. 24

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .................................................. 23

*Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795 (1999).......... 25, 26

*Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011 (8th Cir. 2001).......................................................................................... 26

*Ellison v. Brady*, 924 F.2d 872 (9th Cir.1991)........................................... 33

*Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998) .................................................................................. 34

*Fuller v. Oakland*, 47 F.3d 1522 (9th Cir.1995) ............................................ 33

*Furukawa v. Honolulu Zoological Society*, 85 Hawaii 7, 936 P.2d 643 (Haw. 1997) ........................................................................................ 25

*Harper v. Walingford*, 877 F.2d 728 (9th Cir. 1989)........................................ 24

*Ihekwu v. City of Durham*, 129 F.Supp.2d 870 (N.C. 2000) ............................. 32

*Karella v. Ameritech Information Sys., Inc.*, 953 F.Supp. 945 (N.D. Ill. 1996) ...................................................................................................... 32

*Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827 (8th Cir. 2000)............... 32

*Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986) ...................................................................................................... 24

*Mcconathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558 (5th Cir. 1998) ...................................................................................................... 34

*Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653 (D.Puerto Rico 1997)................................................................................................ 33

*Smith v. Midland Brake, Inc.*, 180 F.3d 1154 (10th Cir. 1999) ............................. 26

*Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054 (9th Cir. 2002...................... 37

*Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681 (8th Cir. 1998) ...................................................................................................... 35

*Weyer v. Twentieth Centory Fox Film Corp.*, 198 F.3d 1104 (9th Cir. 2000) .................................................................................................. 24, 25

## TABLE OF AUTHORITIES
### (continued)

**Page**

*Zivkovic v. Southern California Edison Co.*, 302 F.3d 1080 (9th Cir. 2002) ................................................................................ 26

### STATUTES

HRS § 378-2 ........................................................................... 25

HRS § 368-11 .......................................................................... 31

### OTHER AUTHORITIES

42 U.S.C. § 12111(8) ............................................................... 24

42 U.S.C. § 12112(b)(5)(A) ...................................................... 26

42 U.S.C. § 12113(a) ............................................................... 26

42 U.S.C. § 12113(b) ............................................................... 27

42 U.S.C. § 2000e 5 ................................................................. 31

42 U.S.C.A. § 12117 ................................................................ 31

### RULES

Fed. R. Civ. P. 56(c) ............................................................... 23

## MEMORANDUM IN SUPPORT OF MOTION

### I.     INTRODUCTION

Defendant St. Francis Medical Center ("St. Francis" or "Defendant") moves this Court for an Order granting summary judgment in its favor and against Plaintiff Cara Loeser ("Plaintiff") on the following grounds: (1) Plaintiff's claims for unlawful disability discrimination (Counts I, II, and III) are barred because Plaintiff is not a "qualified individual" protected under the laws; (2) Plaintiff's failure to reasonably accommodate claims (Counts I and III) are barred because a possible accommodation did not exist; (3) Plaintiff's hostile work environment claims (Counts II and III) are barred by failure to exhaust administrative remedies, lack of severe and pervasive conduct, and Plaintiff's failure to report the conduct; and (4) Plaintiff's retaliation claim (Count III) is barred by the absence of an adverse employment action and Defendant's legitimate business reasons.

### II.     BACKGROUND FACTS

#### A.     **Plaintiff's Performance in Pharmacy Technician Position**

Plaintiff was hired as a Pharmacy Technician by St. Francis Medical Center (hereinafter "Defendant") in 1990.  *In re Hawaii Teamsters & Allied Workers, Local 996, IBT on behalf of Cara Loeser v. St.Francis Medical Center* Transcript of Proceedings on June 26, 2002 (hereinafter "Exhibit A") at 97:21. Her main duties involved assembling patient medications and delivering the

medications to patient floors. Exhibit A at 13:2-25; 14:1-25; 15:1-11; Deposition of Cara Loeser on August 23 and 24, 2005, attached as Exhibit B, at 57:8-17 and Exhibit 8 thereto. The job required the ability to respond to unpredictable emergency requests for prescriptions. Exhibit B at 171:8-13.

Plaintiff notified Defendant of her diagnosis of Multiple Sclerosis ("MS") in 1998. Complaint at ¶ 10. In a SSA form, Plaintiff described her symptoms as follows: "Paresthesial of face/limbs/body, weakness, numbness of arms, sensory loss in face/limbs, intermittent loss of vision, speech, hearing, awareness of self / surroundings and dizziness." Exhibit 26 at 2 and Exhibit B at 201:25; 202:1-25; 203:1-14.

Defendant attempted to provide her with light duty and other accommodations for over one year from November 1999 through December 2000. Exhibit B at 128:19-25; 129:11-25. Plaintiff was allowed a regular shift instead of rotating to accommodate her medication schedule. Exhibit A at 109:6-18; Exhibit B at 72:17-24; 85:8-14; 111:21-25. She was not required to lift any heavy boxes over twenty pounds. Exhibit A at 112-12. Certain functions, such as delivering medications in heavy carts to patient floors, were eliminated from her work duties. *Id.* at 14:6-24; 108:11-14. She was allowed to perform more clerical functions. *Id.* at 108:18-21, 22-25; 109:1-2; Exhibit B at 61:4-10.

Plaintiff had difficulty accepting her medical condition's interference with her ability to safely perform her job by accurately preparing medications:

> Q Did you at some time when you were working at St. Francis come to personally believe that you had a disability?
>
> A Truthfully speaking because of my, my dedication for the patients at the hospital and the fact that I really put my life in for the health industry, I didn't want to accept that. Even if all the symptoms was just attacking me. And no matter how I tried to overlook something that I already was diagnosed with it just, it just attacked me.
>
> ***
>
> And I – I do recall areas where the pharmacist had taken us technicians for our words, like meaning okay, this is the correct medication. But I used to feel like this is so incorrect. Can you please make sure you open the bottle and make sure it is that correct drug? How would you know if I didn't mix something on the bottom of the pill container?

Exhibit B at 56:10-19; 57:11-17.

Despite the accommodations which were provided to her, Plaintiff did not dispute that her condition interfered with her ability to safely and accurately perform the job functions of a pharmacy technician:

> But those are the ones I had to be really careful about was because I told them, you know, even when I'm doing this can you make sure that I did pull the right drug? Which was always as accurrate. The errors they found in the past like, you know, it says a certain medication but you pulled something else. You need to read more closely.Those are some – I noticed those are things that I started to be more aware of. It's like my vision again. Or am I in the correct place? Or I have to look at my own type of charts that I created to understand, okay, these are the meds to pull of the shelf.

*Id.* at 61:11-22.

3

The occurrence of Plaintiff's multiple sclerosis symptoms was sudden, and there was no way she could predict the onset of her symptoms. *Id.* at 171:16-19; 173:7-9. The unpredictable nature of her symptoms made it difficult for her to request assistance and to work in emergency situations, resulting in errors and complaints:

> But there were situations where if I'm going to do a typing of a label and my fingers are already just temporarily no sensation then I would let them know. And I did have some accommodations, but of course if pharmacists are also busy with answering doctor's requests or other immediate attention then that—that would have had to been more prioritized. Meaning this is a priority or whatever needs, there's a transplant going on, we needed to prioritize. So there were – there were those evenings where everything was not prioritized and where we had big complaints or areas where supervisors and pharmacists had to meet because something had happened where it was actually the responsibility of the pharmacist. But it again would be reflecting on the technicians because that was the job description itself.

*Id.* at 172:16-25; 173:1-6.

Plaintiff explained that the situation resulted in delay in emergency situations, such as where the pharmacists were assisting with organ transplants:

> But there were times where if it – if we were really just so overwhelmed with prescriptions and the doctors are requesting for heavier glass medications and so forth, there are times where I knew I could do the job, but there were times were the attacks had suddenly just happened, you know, without my knowledge and areas where I would have to tell them, you know, I would need assistance, So can you please ask the transporter to come down and deliver these meds for me. Those are areas where I already was aware that it was frustrated moments for a pharmacist where, no Cara, you need to understand that when we have these transplants you need to be aware

of the situation. And it's like, well, you know, there's just a technician at night, which is me, and just the night pharmacist, you know, and I do my best. If there's something that needs emergency delivery I can do it. But if there's something that happens to me also this is where I need some accommodation or I need an assistant. Or this is what happened while there was a delay. But there are incidents where that happened.

*Id.* at 81:20-25; 82:1-16.

Plaintiff's unpredictable symptoms resulted in her inability to physically move to fill prescriptions:

Q: ...And whenever those [symptoms] occurred were you limited to whatever staff was there at the time?

A: I would be limited if – if a symptom had occurred. So, and as I said, **my symptoms could just happen without my knowledge until I'm not able to really move.**

*Id.* at 171:14-19 (emphases added). Her symptoms included heaviness in her arm which resulted in damage to equipment costing thousands of dollars:

there were symptoms where again I wasn't aware of where areas of heaviness in my arm to the point where I had to remember that don't carry any heavy IVs, because there were incidents where I accidentally carried it in this right hand and it fell and shattered. And it costs like over thousands of dollars.

*Id.* at 68:13-18.

Plaintiff's unpredictable symptoms occurred on a daily basis interfering with her ability to perform her job:

So those were areas where I had to make sure that I was aware that, Cara, **even if you're not going to have something happen to you at that moment make sure this cart is next to you so if I started to feel as though I had this insecurity that there is – I need a cart**

**next to me or I need a chair** in case there's areas where I felt I'm not going to – or **I lose (sic) my judgment or vision symptoms or heaviness on the right side.** I mean it never seemed to go. **It never seemed to just where there was a day of no symptoms.** There's always a day of symptoms, some type of incident happening to those areas where I had to work and make sure that I'm aware that you can't do this, you need to do it left hand, or if **there's something that you know you're not going to be able to do let the pharmacist know.**

But it just didn't – for them it was getting frustrating because the coverage, get insufficient staffing, and it was just a technician and a pharmacist at night, besides a transporter. A transporter who we had to call from the department. You know, we had to always call a transporter to do certain deliveries that I couldn't do.

*Id.* at 68:19-25; 69:1-15 (emphases added), 168:25; 169:1-10 (describing

unpredictable nature of her attacks).

**B.    Plaintiff's Transfer to Admissions Registrar position**

Due to Plaintiff's concerns regarding her ability to perform the

Pharmacy Technician functions and pursuant to her request, Plaintiff bid for and

was accepted into the position of Admissions Registrar on December 4, 2000.

Exhibit A at 113:25; 114:1-2. Plaintiff was not forced to apply or precluded from

remaining in the Pharmacy Technician position at that time. Exhibit A at 98:22-25;

99:1-7. Plaintiff herself wanted a clerical position:

Q: Isn't it true that you're the one that sought, that said you wanted a clerical position?

A: Yes.

Exhibit A at 113:12-15. She applied "not for them, but for me, by applying for that admissions, and also complying with the request of the human resource manager." Exhibit B at 86:25; 87:1-4. She did not apply for the position just to please the pharmacy department. *Id.* at 73:21-25; 74:1.

Plaintiff was given an advantage over other applicants as an accommodation for her disability:

> Q [I]s it your understanding that you were given an advantage over other people of equal seniority in bidding for the admissions position?
>
> A My understanding, yes, I was given an advantage to accommodate my disability.

*Id.* at 197:7-11. The position was also at the same rate of pay as her prior position and included a more desirable morning shift. *Id.* at 191:4-9.

### C.    Plaintiff's Performance in Admissions Registrar Position

The Admissions Registrar position requirements included the ability to work independently to "complete [patient] registration and/or bed control responsibilities working independently without relying on others to complete their own work"; to follow through in a "timely and accurate" manner; to multi-task: "It is an erratic, unpredictable and can be hectic, therefore the ability to remain calm and the ability to multi-task and prioritize are crucial…."; "Ability to learn registration and bed control without having to rely heavily on other staff after being trained with the basic skills…."; "the ability to react to assist the patient is

essential"; "ability to….react to registration requests in a timely manner"; "Ability to deal with volatile patient"; and "Ability to deal with exposure to [emergency] patient care…." Exhibit 17 to Exhibit B and Exhibit B at 136:16-25.  Plaintiff also worked on "a patient's demographics or call patients at home to remind them of their appointments or update their records."  Exhibit B at 90:22-24. On December 4, 2000, Plaintiff was provided with the Admissions Department Orientation and Training. Ex. 16 to Exhibit B; Exhibit B at 134:13-23.

Plaintiff was provided with accommodations in being able to stand and walk when needed. Exhibit B at 77:6-15; 191:8-18. She was also provided with special assignments until "we started to also become insufficient staff where there was girls calling in and really because of the hours that they were working they, too, got ill." *Id.* at 77:12-15.

Within four weeks, by January 2001, Plaintiff's fellow admission registrars approached her regarding her difficulty performing the job functions. Exhibit A at 114:3-7. Plaintiff sought additional training:

> A:  I asked one of the admission registrars who was more on an experienced level to guide me in questions that I had concerns and needs of.
>
> Q:  And were they cooperative?
>
> A:  Yes, they were.

*Id.* at 114:12-16.[1]

The admissions position required memorization of insurance codes and accurate inputting to ensure Defendant received timely reimbursement. Exhibit B at 77:18-20; 184:7-14. Plaintiff did not dispute that she had difficulty performing paperwork and memorizing billing codes, which she attributed to her technical background rather than her disability: "[T]he fact that I happened to be more of a technical person versus all of a sudden accommodated to clerical I had no – the ten years in pharmacy was all mainly technical and all of a sudden here I am with paperwork or codes that I needed to memorize." *Id.* at 77:21-25. Plaintiff conceded that although she was "going to give it a try and . . . see where my areas in clerical could – I could withstand[,]" she found "out that those responsibilities were more of a higher expectation." *Id.* at 73:25; 74:1-3.

Plaintiff had difficulty performing her clerical functions due to her medical condition. While sitting at the computer she would have "numbness or like heaviness to the point where . . . I'm not able to type." *Id.* at 76:19-21. She also testified that because the right side of her body would become numb, she was not able to write because she was right-handed. *Id.* at 76:22-23. She testified: "I was

---

[1] Three years later, Plaintiff's story has changed. She explained at her deposition that the only instruction she was given was to "do this type of example and that was it. No other sit down explanation or [explanation] of the way the performance should have been done." Exhibit B at 141:20-23. She also explained that "if I was orientated I was also orientated by another admissions registrar. And every admissions registrar they have their own way of training or orientating." *Id.* at 141:24-25; 142:1-2.

experiencing unknown heaviness again on my right side where I wasn't able to write. I do remember that. And when I had answered the phone it had already areas where I wasn't able to reach the pen because I couldn't move. And I was having problems trying to talk on the phone and write with the left hand. And there was no one in the room with me. We have a separate room where we're like operators. And there was no one with me at that moment." *Id.* at 143:11-19.

Plaintiff experienced disorientation: "I'm looking at a . . . patient's demographics, . . . and at that moment I would ask myself how did I again get into . . .I don't recall sitting down at that moment." *Id.* at 89:14-17. She explained, "[t]here are incidents where I can't recall how it was delivered to me or did I pick it up or did I walk from that area of the front of admissions department to this cubicle here?" *Id.* at 89:19-22.

Her symptoms interfered with her ability to respond to emergencies:

If you're working a certain shift from the morning on a rotation you get sent to ER where you're in that office by yourself and also filling in information as ER patients come in. I was not given sufficient time to really handle a situation on an area where you have to be fast. I mean…-- it was a demanding job. There's like two to three people coming in and you have to be able to make sure that you're fast on the computer. And then if I'm having problems, you know, if my fingers are constantly getting loss of sensation and I'm trying to ask for help I was not accommodated.

*Id.* at 185:9-20.

Her symptoms could also result in interruption and delay of service to

patients:

> Yes, I believe I could have done the job. And also at the same time
> with consideration that should I have that symptom at that time to let
> them know immediately so that way in case there' something that I'm
> with a patient updating demographics and I'm not – unable to receive
> that information, my results would be to say let the patient know that I
> will call them in couple minutes. There's a – there's a situation where
> it needs to be addressed. And thank them for their understanding.

*Id.* at 214:24-25; 215:1-8.

Again, the unpredictable nature of her symptoms made it difficult for

her to notify management in advance: "I did not have the opportunity to let them

know. As I said my symptoms had happened unpredictably and it was too late

where there was no additional help. So my movements or production would be a

little bit more on the slower side where then later another clerk would come in and

have to take over." *Id.* at 186:4-10.

Plaintiff was granted a ninety-day probationary period from

December 4, 2001 to March 5, 2001. *Id.* at 138:13-17; 141:6-12. During this

period, Plaintiff was provided with performance evaluations and counseling

regarding the improvement needed. Exhibit C. Due to failure to improve, Plaintiff

was placed on vacation on March 31, 2001 and given assistance in obtaining

another job with Defendant.  Exhibit A at 47:17-27; 48:1-4; 50:2-4; 51:18-25;

11

52:7-9. The reasons for the decision were her inability to perform even simple

tasks such as telephone work:

> Q What is your understanding as to why you were placed on vacation from the admissions position?
>
> A. ....My understanding...was because I did not fulfill requirements of admissions of St. Francis Liliha regarding mainly insurance codes that dealt with serious reimbursements on a timely basis. And also other duties as far as being able to do the telephone operating work to call and remind patients or update their demographics. Those are one of the areas that was addressed where there were incidents where I was all right and all of a sudden if my right side just suddenly attacked me, those are things where it did produce resentment. Because it, in the eyes of those registrars they felt it was a simple task. But it's not simple if you're the one with that disability. It's not a simple task if you're the one afflicted with that.

Exhibit B at 213:19-25; 214:1-10.

**D.     Plaintiff's Attempts to Find New position**

Defendant attempted to assist Plaintiff in obtaining another job and

she never asked to be returned to the Pharmacy Technician position:

> Q:  You stated that you wanted to return to the pharmacy when it became apparent that it wasn't going to work out in admissions.  Did you ever tell Susan Hashimoto that?
>
> A:  No.
>
> Q:  You did have conversations with her where she tried to show you other opportunities that might be available in the hospital, isn't that correct?
>
> A:  Yes.

> Q:  And during none of those conversations did you tell her that what you wanted to do is go back and be a pharmacy tech?
>
> A:  No, I didn't mention that.

Exhibit A at 50:23-25; 51:1-4; 114:17-25; 115:1-4.

Plaintiff did make the effort to find another position: "[I] do recall bidding for some positions and being notified by letter....that the position was given to someone, another qualified applicant." Exhibit B at 146:24-25; 147:1-2.

According to Defendant's records, it made several attempts to assist Plaintiff to find a new position over a four month period. Exhibit  D. Plaintiff bid for the Patient Account Processor position. *Exhibit* E.  This position required a detailed understanding of patients' medical insurance coverages. Defendant determined that Plaintiff was not qualified for the position given Plaintiff's inability to memorize billing codes needed for insurance reimbursement purposes and to perform related clerical functions as an Admissions Registrar. *Hashimoto Declaration*. Plaintiff testified that the Admissions Registrar position required memorization of insurance billing codes and accurate inputting to ensure Defendant received timely reimbursement.  Exhibit B at 77:18-20; 184:7-14. Plaintiff did not dispute that she had difficulty performing paperwork and memorizing billing codes, which she attributed to her technical background rather than her disability: "[T]he fact that I happened to be more of a technical person

13

versus all of a sudden accommodated to clerical I had no – the ten years in

pharmacy was all mainly technical and all of a sudden here I am with paperwork or

codes that I needed to memorize." Id. at 77:21-25.

Plaintiff also applied for two Medical Records Clerk positions which

required attention to detail including processing, analyzing, and reanalyzing

medical records for quality and completeness; verifying, correcting, and updating

patient information; tabulating statistical data relating to admissions and

discharges; pulling incomplete records and providing chart completion assistance

to staff; monitoring completion of Medicare forms in conjunction with

coder/abstractors; and answering telephone calls. *Hashimoto Declaration*; Exhibit

E. Again, Defendant selected more qualified employees for these positions, since

many of the errors made by Ms. Loeser while working as an Admissions Registrar

had to do with the entry of inaccurate information on records. *Id*.

Due to her inability to find another position over a three month period,

Plaintiff's employment with Defendant was terminated on July 31, 2001. Exhibit

A at 48:7-10; 63:24-25; 64:1; 79:8-16.

### E.     Reasonable Accommodations Requested by Plaintiff

Plaintiff felt that Defendant could have reasonably accommodated her

by providing her with a person to assist her when her symptoms occurred. Exhibit

B at 72:23-25; 73:1-2; 82:12-14; 157:18-22; 159:18-25; 160:1-25; 161:1-6.

However, she did not dispute that providing a personal assistant to Plaintiff would have imposed a hardship on Defendant:

> But for me it was I can do this but I also need the assistance of someone else just for that time being. But to them it was impossible. Even for 45 minutes of my time with the – with that extra help it was a hardship for them. It was – to be truthful it was a hardship. In the pharmacy it's – it's a very strenuous operation. If you don't have sufficient help it can be a liability. The pharmacists need to see it that way. But I guess because budget again, budget cut and enough, just enough workers.

Exhibit B at 83:18-25; 84:1-3. She did not dispute that Defendant never had sufficient staffing and had budget concerns. *Id.* at 59:25; 60:1-4.

Susan Hashimoto testified that Defendant had financial struggles for the last couple of years:

> There is absolutely no excess of resources. We lost $22 million last fiscal year, and it's estimated we will lose five to six at the end of this fiscal year. We are in the red, and we've made no secret of that.

Exhibit A at 64:16-20.  As a result, the work force had contracted significantly. *Id.* at 64:7-10.

Plaintiff also testified that Defendant could have returned her to the Pharmacy Technician position. Exhibit B at 154:7-10. However, she ultimately testified that she realized this was not possible and what she really sought was for Defendant to create a new position:

Q So did you realize that you couldn't go to the position that you originally had, so instead wanted to go to a position you wanted them to create, is that correct?

A Yes.

Q Okay. To your knowledge did they ever create that position?

A No.

*Id.* at 187:5-12.

She explained that a new position different from any existing position could have been created to accommodate the unpredictable nature of her symptoms:

Q Is there anything that you think that St. Francis could have done to accommodate the fact that your symptoms were entirely unpredictable?

A As I mentioned earlier, yes, when we did suggest clerical duties, which was a creation that's pertaining to pharmacy and not the billing department. I mean for, you know....there was a pharmacy clerk but it was dealing with more of the billing and patient work.

Q. Okay. So the response would have been to create that new position that was different than any position that existed at the time?

A Yes, and it's more pharmacy duties, as far as paperwork of the narcotics or recording of patient medication errors and so forth.

*Id.* at 173:19-25; 174:1-8.

**F.    Alleged Friction Between Plaintiff and Coworkers**

During an arbitration hearing on June 26, 2002, Plaintiff testified her co-workers in the pharmacy department never expressed displeasure to her regarding her performance deficiencies:

Q: Isn't it true that other pharmacy techs were displeased because they had to pick up the slack of the work that you were not doing?

A: I'll say yes, although they, it wasn't shown to me or wasn't even – I wasn't confronted.

Exhibit A at 113:7-12. She also testified that her fellow admission registrars made her aware of performance concerns, but testified that they were cooperative in providing her with additional training:

Q: At what time did your fellow admission registrars approach you and indicate that you were having difficulty?

A; I'll say it was within the four weeks, at least before January 2001.

Q: Did you seek additional training when they indicated you were having problems?

A: Yes, I did.

Q: Who did you ask?

A: I, I asked one of the admission registrars who was more on an experienced level to guide me in questions that I had concerns and needs of.

Q: And were they cooperative?

A: Yes, they were.

*Id.* at 114:3-16.

Further, in her Charge of Discrimination filed with the Hawaii Civil Rights Commission on October 9, 2001, Plaintiff made no reference to a hostile work environment or to harassment. *Exhibit* F.

Yet, years later at her deposition on August 23-24, 2005, Plaintiff testified that her co-workers created a hostile environment due to their resentment over Plaintiff's treatment:

> They felt like I was being accommodated to areas where they, they didn't want to agree to that. More like that word, I'll always remember that word, like she's got this cream of the crop position.

Exhibit B at 62:7-10. Plaintiff alleged "there were too many frustrated technicians saying that it's unfair that they have to rotate and I didn't have to rotate." *Id.* at 70:12-15. She explained, "I was actually told by other technicians that…they weren't happy, that their position, especially rotating, it was unfair because I had to be accommodating. And their concerns was what if they were disabled? Would they be accommodated?" (*Id.* at 188:5-10) and "But I was totally constantly reminded how bitter they were or, you know, don't mind us for not saying hi to you" (*Id.* at 188:15-17). Plaintiff added "And that's what created a hostile environment. It was getting to the point where this – this project was not completed because somebody was not able to do it because this person was not feeling well. And that was the truth. I mean it's unpredictable what I had gone through." *Id.* at 169:23-25; 170:1-3.

Plaintiff testified that she complained to her supervisor, and that ultimately he suggested that she apply for a clerical position. *Id.* at 190:10-20.

After she transferred to the Admissions Registrar position, she testified her

coworkers in that department also complained her treatment was unfair: "But, and

then again it had caused areas where complaints of – from the other registrars that,

you know, because she can't do this of her disabilities, you know, they felt that it

was unfair, too. And I was also approached with those comments." *Id.* at 191:19-

23.

However, she did not bring these comments to her supervisors'

attention:

> Q Did you complain to your supervisors about those comments?
>
> A I never had a chance to.
>
> Q what do you mean?
>
> A Because it was never brought up to me….[I]t was on a day that I was working on a weekend but there was no supervisor until a certain time. So it – it never occurred where I had that chance to bring up situations without causing a hostile environment where we all had to gather and say…this is what the issue is. But it never happened. Because I never had the opportunity due to over workload and possibly forgetting to mention it to the supervisor.

*Id.* at 195:10-25.

> Plaintiff felt these types of comments were retaliation:
>
> I was also approached as….your situation where you're not able to do a certain responsibility, you know, it makes us overloaded with work. And the thing is did you feel that….maybe this is not your type of position?......[T]hose are the types of remarks was also said in admissions, which I feel was like a retaliation. If you cannot do…your responsibilities, but we understand it's – can't be helped because

19

you're disabled then why don't you go and look for another position?
That is my understanding of retaliation.

*Id.* at 194:20-25; 195:1-7.

### G.    Subsequent Inability to Maintain Employment

Due to financial pressure, Plaintiff sought subsequent employment.

Exhibit G, Plaintiff's Response to Defendant's First Request for Answers to

Interrogatories dated November 22, 2005; Exhibit B at 30:10-15, 18-22; 31:1-6;

32:3-12, 12-16; 33:9-22, 23-25; 34:1-6; 35:22-25; 36:1-12; 38:18-22; 42:17-25;

43:1.

However, her symptoms prevented her from satisfactorily performing

subsequent jobs.  While working at the West Oahu YMCA, Plaintiff had difficulty

performing even light duty and could only teach Pilates once a week:

> So my teaching skills were really limited.  Like I could only teach on
> a Monday evening and that was it. . . . It wasn't like a Monday,
> Wednesday or Friday type of teaching, it was just once a week.
>
> ***
>
> Symptoms would be fatigue or weakness that just would attack me.
> Even if I had to sit down and teach I was still attacked with symptoms.
> It didn't matter if it was a light type of duty but I was always going
> through it.
>
> ***
>
> There were accommodations where maybe there would be a night
> where I'm not able to teach because I've had something that happened
> and I wasn't able to perform, like weakness from the waist down.
> There were incidents where I had to call for an emergency instructor
> or ask for a substitute.

***

> Or lots of times if there's shortages of instructors the class would be canceled.

Exhibit B at 30:10-15, 18-22; 31:1-6.

Despite her difficulty performing even light duty once a week, Plaintiff quit her job at YMCA and sought full-time employment without consideration of her disability status so that she could obtain health insurance coverage:

> [My employment at YMCA] came to an end when I had told them that I needed to apply for a position that would help me with health benefits. I was so concerned because I wasn't able to afford my Avonex during that times...And which is the reason why I had to apply for a job that would just hire me. Didn't matter on, you know, my status.

*Id.* at 32:3-12.

Plaintiff next applied for a job at Island Mini Mart and worked from August to November 2002. Exhibit G. However, this employment did not last due to her inability to perform her duties: "And, boy, there were areas where I wasn't able to perform a lot of their duties. And I didn't last there either." Exhibit B at 32:12-16. Plaintiff explained that she required others to personally assist her with performing her cashier, light housekeeping, and stocking duties:

> And there were times when I wasn't able to grip so they always had to have a supervisor. And at the same time she had to help cashier whenever I had a symptom attack.

*Id.* at 33:9-22. Island Mini Mart had someone else perform restocking or cashiering duties for her when needed. *Id.* at 33:23-25; 34:1-6. She did not pursue another position at Island Mini Mart due to her physical symptoms, including weakness, incontinence, accidents, and falling. *Id.* at 35:22-25; 36:1-12.

Plaintiff next worked at Kinko's from December 2002 to August 2003. Exhibit G. Plaintiff testified: "So I had to lean or either go in the corner of the express area and just kind of like lean back if I was losing my balance. You know, especially again experiencing this weakness it was really bad at Kinko's. And I had the same problem with gripping money to those areas where I had to use a pen, like a pen to scoop the coins out of the tray. Or even to try to pull a dollar bill out I would have to have an emergency [sic] like a tweezer." Exhibit B at 42:17-25; 43:1. Due to her difficulty walking, she went on temporary disability for three months. *Id.* at 38:18-22.

Plaintiff next taught aqua aerobics part-time at the Kaimuki YMCA from September 2003 to January 2004. *Id.* at 40:20-24; 41:2-5. While employed there she testified that she "had bad symptoms as far as teaching class right at the pool and not able to – not able to see the class at that moment, where the whole class would just go into areas, where is my class? You know, that's how bad my vision was." *Id.* at 46:2-6. Her employment ended when she had a really bad attack. *Id.* at 41:5-9.

22

Plaintiff applied for Social Security Disability benefits in December 2002, and represented that she was unable to work. Exhibit H. Ultimately, the Social Security Administration determined that Plaintiff was permanently and totally disabled from working as of July 31, 2001, the date that her employment at Defendant ended. Decision dated June 20, 2005, attached as Exhibit I; Exhibit A at 63:24-25; 64:1; Exhibit B at 23:16-20; 25:7-9.

## III.    ARGUMENT

### A.    Standard for Summary Judgment

Summary judgment shall be granted where there is no genuine issue of material fact and the moving party is entitled to judgment as a matter o f law. *Beaulieu v. Northrop Grumman Corp.*, 161 F.Supp.2d 1135, 1139 (D. Haw. 2000), citing Fed. R. Civ. P. 56(c).

The United States Supreme Court has declared that summary judgment must be granted against a party who fails to demonstrate facts to establish an element essential to his case where that party will bear the burden of proof of that essential element at trial. *Id.* at 1140, *citing Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The Ninth Circuit has established that "[n]o longer can it be argued that any disagreement about a material issue of fact precludes the use of summary

judgment." *Id.* at 1140, (*citing California Architectural Bldg. Products, Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987)).

The non-movant's burden to demonstrate a genuine issue of material fact increases where the factual context renders her claim implausible: "[I]f the factual context makes the nonmoving party's claim implausible, that party must come forward with more persuasive evidence that would otherwise be necessary to show that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Mere disagreement or the bald assertion that a genuine issue of material fact exists no longer precludes the use of summary judgment. *Harper v. Walingford*, 877 F.2d 728 (9th Cir. 1989); *California Architectural Building Prods., Inc. v. Franciscan Ceramics, Inc.*, 818 F.2d 1466, 1468 (9th Cir. 1987).

**B.    Plaintiff's Disability Discrimination Claims Are Barred Because She is Not a "Qualified Individual."**

The plain language of Title I of the Americans with Disabilities Act allows only those who are "qualified individuals" to bring suit. *Weyer v. Twentieth Centory Fox Film Corp.*, 198 F.3d 1104, 1108 (9th Cir. 2000). A "qualified individual" is "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." *Id.* (*citing* 42 U.S.C. § 12111(8)). A plaintiff

bears the burden of proving that she is a "qualified individual with a disability."
*Id.* A totally disabled person who cannot "perform the essential functions of the
employment position" with or without reasonable accommodations thus cannot be
a "qualified individual" entitled to sue under Title I of the Act. *Id.*

Standards developed under the ADA can also be applied to claims
brought under Hawaii law: "The court will consider the [disability discrimination]
claims under the ADA and HRS § 378-2 together, as the Hawaii Supreme Court
looks to federal law to interpret state employment discrimination law. *Beaulieu*,
161 F.Supp.2d at 1142 n.1 (*citing Furukawa v. Honolulu Zoological Society*, 85
Hawaii 7, 13, 936 P.2d 643 (1997); *Bradley v. Harcourt, Brace and Co.*, 104 F.3d
267, 271 (9th Cir. 1996)).

The United States Supreme Court held that an ADA plaintiff cannot
simply ignore the apparent contradiction that arises from the plaintiff's sworn
assertion in an application for total disability benefits that he or she is unable to
work. *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806, (1999). The Court
ruled that:

> [w]hen faced with a plaintiff's previous sworn statement asserting
> "total disability" or the like, the court should require an explanation of
> any apparent inconsistency with the necessary elements of an ADA
> claim. To defeat summary judgment, that explanation must be
> sufficient to warrant a reasonable juror's concluding that, assuming the
> truth of, or the plaintiff's good-faith belief in, the earlier statement, the

plaintiff could nonetheless "perform the essential functions" of [his or] her job, with or without "reasonable accommodation."

*Id*. at 807.

If a plaintiff is arguing that she was qualified with some accommodation, she must produce evidence to show that a specific reasonable accommodation would have allowed her to perform her duties and was available at the time of her discharge. *Bass v. County of Butte*, 2004 U.S. Dist. Lexis 17191, (E.D. Ca. 2004), (*citing Zivkovic v. Southern California. Edison Co.*, 302 F.3d 1080, 1088 (9th Cir. 2002)). An employer need not make an accommodation if it imposes an undue hardship. 42 U.S.C. § 12112(b)(5)(A).

Employers are required to consider disabled employees only for existing, open positions. *Cravens v. Blue Cross and Blue Shield of Kansas City*, 214 F.3d 1011, 1019 (8th Cir. 2001).

Employers are not required to modify the essential functions of a vacant job in order to make it suitable for the disabled employee. *Smith v. Midland Brake, Inc.*, 180 F.3d 1154, 1170 (10th Cir. 1999). Indeed, it is a defense to a charge of employment discrimination that an alleged application of qualification standards to an individual with a disability is "job-related and consistent with business necessity, and such performance cannot be accomplished by reasonable accommodation…." 42 U.S.C. § 12113(a).

The ADA defines "qualification standards" as including "a requirement that an individual shall not pose a direct threat to the health or safety of other individuals in the workplace. 42 U.S.C. § 12113(b). In *Bass*, *supra*, the Court applied the direct threat defense to bar disability discrimination claims where it was not disputed that a significant physical or mental lapse by the plaintiff working in a chemical plant as a result of a diabetic episode, which could result in a loss of alertness and ability to communicate, could result in substantial harm to others.

In the present case, Plaintiff applied for Social Security disability benefits and represented that she was unable to work at Defendant or anywhere else. Exhibit I.  Ultimately, the Social Security Administration found that Plaintiff was totally and permanently disabled and unable to work as of July 31, 2001, the date of her termination from employment with Defendant.  Exhibit J. Plaintiff's deposition testimony does not explain the apparent inconsistency between that determination and her contention in this lawsuit that she is a "qualified individual" who could perform essential job functions while employed with Defendant.

Instead, Plaintiff testified that she was unable to safely and accurately perform the Pharmacy Technician position and was unable to work in emergency situations requiring quick action. Her condition resulted in errors in the filling of medications. Exhibit B at 57:2-9; 171:7-19. She had difficulty responding to

emergency situations, resulting in errors, complaints, and delays. *Id.* at 81:20-25; 82:1-16; 160:9-10, 21-23. She would be unable to move. *Id.* at171:17-19. Heaviness in her arm caused her to drop and shatter equipment costing over thousands of dollars. *Id.* at 56:22-24; 68:13-18. She had unpredictable symptoms on a daily basis, including loss of judgment. *Id.* at 68:19-25; 69:1-5; 168:25; 169:1-10.

   As an Admissions Registrar from December 2000 to March 2001, she had difficulty memorizing billing codes, which she attributed to her technical background rather than her disability. *Id.* at 77:18-20, 21-25; 184:7-14. In addition, her symptoms interfered with her ability to perform even simple tasks and to perform her duties on a timely basis. *Id.* at 214:7-10. At times, she was unable to type or write due to numbness or heaviness. *Id.* at 76:19-21, 22-23; 143:11-19. She had incidents of confusion and disorientation. *Id.* at 89:14-17, 19-22.  Her symptoms interfered with her ability to respond to emergencies and to work quickly. *Id.* at 185:9-20; 214:24-25; 215:1-8. She felt that although she was unable to receive information from patients, she should have been allowed to tell patients she would call them back. *Id.* at 215:3-8.

   The unpredictable nature of her symptoms made it impossible for her to ask for help from management in advance. *Id.* at 186:4-10. She did not dispute that Defendant repeatedly attempted to accommodate her starting in November

28

1999 until July 31, 2001, when her employment was terminated. Exhibit A at

108:11-25; 109:1-18; 110:6-22; 111:17-25; 112:1-15, Exhibit B at 61:2-22; 72:16-

22; 85:8-18; 86:10-24; 111:21-25; 113:25; 114:1-16; 115:14-23; 116:1-4; 128:19-

25; 129:1-25; 165:13-17; 191:1-9; 197:7-11

   When asked what type of accommodations could have been possible,

she identified only accommodations that an employer is not required to make: (1) a

personal assistant; (2) reallocation of essential job functions; and (3) creation of a

brand new position.  Exhibit B at 72-73, 82, 157-161, 173, 187.

   Indeed, Plaintiff conceded that a personal assistant would have

imposed an undue hardship on Defendant given its staffing shortages and budget

constraints:

> But for me it was I can do this but I also need the assistance of
> someone else just for that time being. But to them it was impossible.
> Even for 45 minutes of my time with the – with that extra help it was
> a hardship for them. It was – to be truthful it was a hardship. In the
> pharmacy it's – it's a very strenuous operation. If you don't have
> sufficient help it can be a liability. The pharmacists need to see it that
> way. But I guess because budget again, budget cut and enough, just
> enough workers.

Exhibit B at 83:18-25; 84:1-3. Indeed, Defendant attempted to provide her with

extra assistance as an Admissions Registrar until "we started to also become

insufficient staff where there were girls calling in and really because of the hours

that they were working they, too, got ill." *Id.* at 77:12-15.

In her subsequent employment after leaving Defendant, Plaintiff had difficulty performing even light duty on a part time basis (*Id.* at 30:18-23) and even simple cashiering jobs (*Id.* at 33:3-12; 34:7-18). Defendant notes that these jobs did not involve the emergency situations, need to act quickly, safely, and accurately, and the ability to perform independently that were job requirements while Plaintiff worked in a safety-sensitive hospital setting.

In conclusion, Plaintiff's disability discrimination claims (Counts I, II, and III) must be dismissed on the grounds that Plaintiff is not a qualified individual with a disability.

**C.    Plaintiff's Failure to Reasonably Accommodate Claims (Counts I and III) Are Barred by the Absence of Possible Reasonable Accommodations**

An interactive process claim can stand only if there existed a reasonable accommodation for the plaintiff. *Allen v. Pacific Bell*, 212 F.Supp.2d 1180, 1197 (C.D. Cal. 2002). "Employers who fail to engage in the interactive process in good faith face liability...if a reasonable accommodation would have been possible." *Id.* (*citing Barnett v. U.S. Air, Inc.*, 228 F.3d 1105, 1116 (9th Cir. 2000), *vacated in part on unrelated grounds*, 535 U.S. 391, 152 L.Ed.2d 589 (2002)).

As set forth above, the Social Security Administration's determined that Plaintiff was permanently and totally disabled as of July 31, 2001. Clearly,

reasonable accommodation was not possible given Plaintiff's deposition testimony regarding (1) her inability to perform job functions in a hospital setting requiring safety, accuracy, ability to act quickly, ability to work in emergency situations, and ability to work independently; (2) the extensive reasonable accommodations Defendant attempted to provide to Plaintiff from November 1999 to July 31, 2001; (3) her identification of only possible accommodations that an employer is not required to provide (e.g. a personal assistance or creation of a new position); and (4) Plaintiff's inability to perform even part-time light duty jobs or simple cashiering tasks in her subsequent employment.

Therefore, Plaintiff's claims for failure to reasonably accommodate (Counts I and III) should be dismissed.

**D.    Plaintiff's Hostile Environment Claim is Barred by the Failure to Exhaust Administrative Remedies and Absence of  Severe and Pervasive Conduct.**

Before filing a discrimination lawsuit, a plaintiff must first file a timely charge of discrimination with the appropriate agency. Under Hawaii law, a charge of discrimination must be filed within 180 days after the alleged discriminatory practice.  HRS § 368-11. Under federal law, a charge of discrimination must be filed within 300 days.  42 U.S.C. § 2000e 5; 42 U.S.C.A. § 12117 (adopting procedures under Title VII for ADA claims).

The Ninth Circuit Court of Appeals held that "[a]llegations of discrimination not included in the plaintiff's administrative charge 'may not be considered by a federal court unless the new claims are 'like or reasonably related to the allegations contained in the [administrative] charge.'" *B.K.B. v. Maui Police Dep't.*, 276 F.3d 1091, 1100 (9th Cir. 2002). The Court explained:

> [I]t is appropriate to consider such factors as the alleged basis of discrimination, dates of discriminatory acts specified within the charge, perpetrators of discrimination named in the charge, and any locations at which discrimination is alleged to have occurred.

*Id.* at 1100 (emphases added).

Courts have dismissed claims of harassment where no allegations of harassment or a hostile environment were raised in administrative charges alleging disability discrimination. *Karella v. Ameritech Information Sys., Inc.*, 953 F.Supp. 945, 950 (N.D. Ill. 1996)("a charge of harassment does not bear a reasonable relationship to a charge of discrimination . . . since one can be discriminated against because of a disability without ever having been harassment because of it."); *Ihekwu v. City of Durham*, 129 F.Supp.2d 870, 885 (N.C. 2000)(plaintiff failed "to mention hostile work environment and failed to allege that hostile work environment was a factor in Plaintiff's disability discrimination claim."); *Kells v. Sinclair Buick-GMC Truck, Inc.*, 210 F.3d 827, 836 (8th Cir. 2000)(harassment

claim was not reasonably related to an allegation that defendant forced plaintiff's resignation.).

In her Charge of Discrimination filed on October 9, 2001, Plaintiff made no reference to a hostile work environment or to harassment. Exhibit G.[2] Therefore, Plaintiff's harassment claim should be dismissed.

Further, limited case law exists on whether an ADA plaintiff can bring a claim for hostile work environment. Courts outside the Ninth Circuit have allowed hostile environment claims under the ADA. *Rodriguez v. Loctite Puerto Rico, Inc.*, 967 F.Supp. 653, 662 (D.Puerto Rico 1997). Such claims are analyzed under the standards applicable to Title VII hostile environment claims. *Id.*

In the Ninth Circuit to prevail on a hostile environment claim, a plaintiff must demonstrate that he suffered harm "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Ellison v. Brady*, 924 F.2d 872, 875-876 (9th Cir.1991). The working environment must both subjectively be and objectively be perceived as abusive. *Fuller v. Oakland*, 47 F.3d 1522, 1537 (9th Cir.1995). Further, an employer is only liable for failing to remedy harassment by a coworker of which it knew or should have known. *Id.*

---

[2] The HCRC dismissed Plaintiff's charge, finding "no cause" and insufficient evidence of discrimination. Exhibit J.

Because the discrimination laws are not a "general civility code," "offhand comments[ ] and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the terms and conditions of employment." *Faragher v. City of Boca Raton*, 524 U.S. 775, 788, 118 S.Ct. 2275, 2283-2284, 141 L.Ed.2d 662 (1998) (internal quotation marks and citations omitted). Accordingly, "the ordinary tribulations of the workplace, such as the sporadic use of abusive language ... and occasional teasing" are not actionable. *Id.* at 2284 (quotations omitted).

Applying these standards to a disability harassment claim, the Fifth Circuit noted that it would "not, in determining whether employer has engaged in such harassment, elevate a few harsh words or 'cold-shouldering' to the level of an actionable offense." *Mcconathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 564 (5th Cir. 1998). The Court held that the employer did not engage in such harassment when supervisor took alleged actions of becoming angry when employee approached him regarding her need for additional surgery, telling her that she "better get well this time" and that he would "no longer tolerate her health problems," and complaining that it was inappropriate for her to make extensive use of health benefits because of her position as benefits manager. *Id.*

Similarly, the Eighth Circuit refused to find a hostile environment existed where there were numerous incidents of friction between a disabled employee and his coworkers and isolated references to his disability, including a

suggestion that seeing a psychologist was a good method to obtain vacation time, calling the plaintiff an "alcoholic fucker," and drawing pictures on his calendar. *Wallin v. Minnesota Dept. of Corrections*, 153 F.3d 681, 688 (8th Cir. 1998).

In the present case, Plaintiff alleges in her Complaint: "Ms. Loeser was subjected to hostile work environment, through complaints about her accommodation requests from her fellow employees, discrimination and retaliation because of her disability." Complaint at ¶ 15, 24-27 (Count III).

The fact that Plaintiff waited until long after her employment ended to raise allegations of a hostile work environment supports that Plaintiff was not subjected to any severe or pervasive conduct. Indeed, at an arbitration hearing on June 26, 2002, Plaintiff testified her coworkers in the pharmacy department never expressed any displeasure to her regarding her performance deficiencies:

> Q: Isn't it true that other pharmacy techs were displeased because they had to pick up the slack of the work that you were not doing?
>
> A: I'll say yes, although they, it wasn't shown to me or wasn't even – I wasn't confronted.

Exhibit A at 113:7-11. She also testified that her fellow admission registrars made her aware of performance concerns, but testified that they were cooperative in providing her with additional training. *Id.* at 113:3-16.

Over four years after her employment ended, at her deposition on August 23-24, 2005, Plaintiff testified that her co-workers in the Pharmacy Department created a hostile environment due to their resentment over Plaintiff's treatment, making comments like "she's got this cream of the crop position" (Exhibit B at 62:10); that it was unfair they had to rotate while Plaintiff didn't (*Id.* at 70:13-14); "[W]hat if they were disabled? Would they be accommodated?" (*Id.* at 188:9-10); and "don't mind us for not saying hi to you" (*Id.* at 188:16-17).  She testified that her coworkers in the Admissions Department also complained that it was unfair Plaintiff could not do certain tasks because of her disabilities. *Id.* at 191:19-22.  However, she did not bring these comments to her supervisors' attention. *Id.* at 195:10-25.

Plaintiff's claim for a hostile work environment (Count III) should be dismissed on the grounds that the expressions of frustration and unfairness by her coworkers constitute workplace friction and "ordinary tribulations" of the workplace that do not rise to the severe and pervasive level of an actionable offense. Further, Plaintiff did not report alleged severe and pervasive conduct to her supervisors to give them an opportunity to remedy the conduct.

**E.    Plaintiff's Retaliation Claim is Barred by the Absence of an Adverse Employment Action and Defendant's Legitimate Business Reasons.**

In order to prevail on a retaliation claim under the ADA, a plaintiff must make out a prima face case by showing (1) involvement in a protected activity; (2) an adverse employment action; and (3) a causal connection between the two. *Brooks v. San Mateo*, 229 F.3d 917, 928 (9th Cir. Cir. 2003). If the employer presents a non-retaliatory explanation for the employment action, the plaintiff must present evidence sufficient to show that the employer's explanation was pretextual. *Id.* at 1188. Under Ninth Circuit law "circumstantial evidence of pretext must be specific and substantial in order to survive summary judgment." *Id.*, (citing *Villiarimo v. Aloha Island Air, Inc.*, 281 F.3d 1054, 1062 (9th Cir. 2002). The employee must show "either...a discriminatory reason more likely motivated the employer or...that the employer's proffered explanation is unworthy of credence." *Id.* at 1063.

Plaintiff testified that her pharmacy coworkers' expressions of frustration suggestions that she seek another position constituted retaliation:

> I was also approached as....your situation where you're not able to do a certain responsibility, you know, it makes us overloaded with work. And the thing is did you feel that....maybe this is not your type of position?......[T]hose are the types of remarks was also said in admissions, which I feel was like a retaliation. If you cannot do...your responsibilities, but we understand it's – can't be helped because

you're disabled then why don't you go and look for another position? That is my understanding of retaliation.

Exhibit B at 194:20-25; 195:1-7. Yet, Plaintiff admitted that she did not suffer any adverse employment action because she voluntarily transferred to the Admissions Department at her own request. Exhibit A at 113:12-15. The position was at the same rate of pay and included a more desirable morning shift. Exhibit B at 191:1-8.

As to the termination of Plaintiff's employment after Defendant attempted to accommodate her from November 1999 to July 31, 2001, Plaintiff did not dispute her inability to perform her duties and simple tasks in a hospital environment, which she understood was Defendant's true reason for terminating her employment, as set forth in detail above. *Id.* at 141:13-20; 213:19-25; 214:1-2.

In conclusion, Plaintiff's retaliation claim (Count III) should be dismissed on the grounds that Plaintiff did not suffer an adverse employment action due to her disability; rather, her employment was terminated due to her inability to perform.

## IV.    CONCLUSION

For all the foregoing reasons, Defendant respectfully requests that the Court grant it summary judgment against Plaintiff as to all claims.

DATED: Honolulu, Hawaii, February 15, 2006.


/s/ Carolyn K. Gugelyk
A. RICHARD PHILPOTT
CAROLYN K. GUGELYK
LIANN Y. EBESUGAWA

Attorneys for Defendant
ST. FRANCIS MEDICAL CENTER