# EXHIBIT A

1

1    STATE OF HAWAII

2    BEFORE ARBITRATOR EDWARD J. PARNELL

3    ----------------------------------------

4    In the Matter of the Arbitration

5    Between

6

7    HAWAII TEAMSTERS & ALLIED WORKERS,

8    LOCAL 996, IBT,

9             Union,

10

11        vs.

12

13    ST. FRANCIS MEDICAL CENTER,

14             Employer.

15    ----------------------------------------

16

17             CARA LOESER GRIEVANT

18        Proceedings taken at the office of Marr

19    Hipp Jones & Pepper, Pauahi Tower, 1001 Bishop

20    Street, Suite 1550, Honolulu, Hawaii, commencing at

21    9:26 a.m., on June 26, 2002, pursuant to Notice.

22

23

24    BEFORE:    DENNIS J. YANKEE, CSR NO. 285

25             Certified Shorthand Reporter

1 when she was a pharmacy tech, the Employer never took

2 the position that with the accommodation she could

3 not perform her duties.

4    There were meetings held, and a decision

5 was made to permit Ms. Loeser to try a different

6 position.  When she was, based on the Employer's

7 contention, unable to perform in that position, the

8 Union contends that under Section 22.6 she should

9 have been returned to the pharmacy tech position that

10 she had previously.  Thank you.

11    ARBITRATOR:  Okay, why don't you

12 proceed with a witness, please.

13    MR. MARR:  Okay.  I'd like to call

14 Susan Hashimoto.  Could you take that seat, please

15 (Indicating).

16     SUSAN HASHIMOTO,

17   having been first duly sworn,

18   testified upon her oath as follows:

19    DIRECT EXAMINATION

20    ARBITRATOR:  Now, I'm going to ask you

21 to speak across me.  This guy has to get every word.

22 And while his hearing is pretty good, let's not push

23 it.

24 BY MR. MARR:

25  Q.  Would you state your name for the record,

1          A.    Well, she didn't come right out and tell

2     me, I don't remember that.

3                    MR. MARR:  Okay, thank you.

4                    MR. KIM:  Nothing further.

5                    ARBITRATOR:  Okay.

6                    MR. KIM:  Next we would call the

7     Grievant:

8                         CARA LOESER,

9               having been first duly sworn,

10          testified upon her oath as follows:

11                    DIRECT EXAMINATION

12    BY MR. KIM:

13          Q.    Can you state your name for the record and

14    spell it, please.

15          A.    Cara Loeser.  Cara is with a C, A-R-A;

16    Loeser, L-O-E-S-E-R.

17          Q.    Ms. Loeser, are you married?

18          A.    No.

19          Q.    Do you have any children?

20          A.    Yes.

21          Q.    How many?

22          A.    Four.

23          Q.    What are their ages?

24          A.    Ages are 29, 27, 26 and 16 and-a-half.

25          Q.    Currently do you have any medical problems

13

1    people, management pharmacists.

2        Q.   Could you tell us generally what a pharmacy

3    tech does in the department?

4        A.   A pharmacy tech helps -- well, one of the

5    main duties of a pharmacy tech is to fill medications

6    in a cart to bring up to the patient rooms.

7             We use something called a unit dose system,

8    and it consists of individual trays filled with

9    medications that a patient will use within a certain

10   prescribed period of time.

11            And a lot of what a pharmacy tech does is

12   fills those trays appropriately with the medications,

13   brings them up to the floor.

14            And then there's a lot of other activities

15   involved with crediting things that come back,

16   charging, charging activities for medication.

17            But that's basically they work, they do

18   that under the direction of a pharmacist, but a lot

19   of that work is, is done by them, the actual putting

20   together of the patient medications.

21       Q.   And how do they put together the patient

22   medications?  First you mentioned they're put into a

23   tray and then first put into a cart?

24       A.   Yes.

25       Q.   How big are the trays?

1    A.    Oh, the trays are, I would say, about

2  4 inches wide and 3 inches tall and very, and quite

3  long, maybe a foot, 18 inches long, and that's the

4  size of a drawer.  And then each little drawer

5  medications then are placed in the drawer.

6    Q.    And how large is the cart that these

7  drawers are placed into?

8    A.    Oh, the cart is probably three and-a-half

9  feet tall by maybe three or 4 feet wide.  I don't

10  know exactly, but that's approximately it.

11    Q.    And how much do these carts weigh?

12    A.    Probably between 60 and a hundred pounds,

13  depending on if it's a new cart or an old cart.  We

14  still have some of the old carts, which are heavy.

15  And as time goes on we've been moving to the newer

16  carts.  The newer carts are lighter.  The older

17  carts, probably the time that Cara was there we

18  probably had those old hundred-pound carts.

19    Q.    So one of the main duties of the pharmacy

20  tech would be to fill the trays and put them in the

21  carts, and then transport the carts up to the patient

22  care areas?

23    A.    That's correct.  That's one of the main

24  duties.  They also use another system called the

25  Pyxis system, which involves the medications are in a

1    fixed location within certain departments, and the

2    pharmacy technician brings medications to those Pyxis

3    machines.  That's another type of dispensing.

4        Q.   So would they transport the medications

5    from the pharmacy up to the Pyxis locations?

6        A.   Yes.

7        Q.   How many Pyxis locations are there, just

8    roughly?

9        A.   Oh, gosh, at least three.  I'm, I'm not too

10   familiar.  I know there's one in the OR and there's

11   one in ER, and I think there is one more.

12                  ARBITRATOR:  How do you spell that,

13   Pyxis?

14       A.   Pyxis, P-Y-X-I-S.  That's the ones I'm

15   familiar with.

16   BY MR. MARR:

17       Q.   Okay.  Let me direct your attention to the

18   Grievant.  Are you acquainted with the Grievant in

19   this case?

20       A.   Yes.

21       Q.   Okay, and did you know her in 1999?

22       A.   Yes, I did.

23       Q.   Let me ask you to turn to Employer Exhibit

24   1.  Here's a set for you.

25   (Document handed to witness)

1          A.    Yes, that she complete her training.  She

2    had issues with the training, and we said okay, fine,

3    we'll give it another few weeks.  She really needs to

4    get more training.

5            If there's a problem with the training,

6    we'll give her some more, a little bit more, and so

7    that the other, so that she would be successful in

8    the job.  That was our goal here, that she would be

9    able to make it.

10         Q.    And you did specifically state that she's

11   unable to return to her previous position as pharmacy

12   tech due to documented physical limitations related

13   to her performance?

14         A.    Yes.

15         Q.    Could you turn to Employer Exhibit 24,

16   please.  What was that message for?

17         A.    Teresa Pytel was the director of

18   admissions, e-mailed me to let me know that, despite

19   the extension of probationary period, there were

20   still problems meeting the requirements and the

21   standards, and that she was going to terminate her on

22   March 30th.

23         Q.    And did she also give Cara some options?

24         A.    Yes.  She recommended two options.  Take

25   the vacation time that she has remaining, or two

48

1    weeks of leave of absence to get another job.  And

2    the second recommendation was to make an appointment

3    with Alan Itomura and work with him to discuss her

4    future, and coordinate a meeting with me.

5         Q.   Let me ask you to turn to Exhibit 25.  What

6    is that document?

7         A.   The date that I found that Cara was not

8    going to be retained I faxed to Alan Itomura a list

9    of all job openings at St. Francis, except for the

10   registered nurse positions.

11        Q.   Why did you do that?

12        A.   Because I wanted to let him know that if

13   we, if we wanted to possibly do Section 29 again we

14   could do that, accommodate the disability.

15        Q.   And so were you prepared to again give her

16   super seniority?

17        A.   If agreeable with the Union, we were

18   willing to do that, yes.  That was the intent in

19   showing her what the openings were -- or showing him.

20        Q.   Let me do you turn to Employer Exhibit 26.

21   What is that document?

22        A.   That's the probationary eval.  This is the

23   trial period evaluation for Cara Loeser.

24        Q.   And that was for the admissions registrar

25   position?

50

1    Q.    What was the reason for the meeting?

2    A.    That was post Cara's leaving the admissions

3    department, and we wanted to try to figure out what

4    we were, what we were to do at that point.

5    Q.    And what happened at that meeting?

6    A.    Alan was questioning what the essential

7    functions of the job were, and that I -- and we had

8    discussed that it was not related to her physical

9    disability that she was not -- unsuccessful.

10    Q.    Was there a discussion about admitting Cara

11    to bump another employee?

12    A.    Yes.  Alan had said that they'll get back

13    to me on a bump after they consult their in-house

14    attorney for an opinion.

15    Q.    By a bump, what did that mean?

16    A.    By a bump he, he had said perhaps that he

17    was not, you know, he wasn't giving me a final on

18    that, but he said maybe we could look at all the jobs

19    at St. Francis, whether they're filled or not filled,

20    and that Cara could possibly take the junior, if we

21    could find a position for which she was qualified,

22    she would take that job if the worker was the junior

23    worker.  So, in other words, you know, displace

24    another worker, the junior worker, from a clerical

25    position.

51

1    Q.    And did he get back to you on whether the

2    Union would be willing to do that?

3    A.    Yes.   He got back to me very shortly

4    thereafter.

5    Q.    What did he say?

6    A.    He said Mike Chambrella said no way,

7    basically, so many words.

8    Q.    Let me ask you to turn to Employer

9    Exhibit 28.   That refers to a meeting on April 6th?

10   A.    Yes.

11   Q.    Could you tell us about that meeting?

12   A.    The meeting on April 6th was --

13   Q.    I'm sorry, it appears to refer back to the

14   April 2nd meeting.

15   A.    Yes.

16   Q.    Is this the report of the April 2nd

17   meeting?

18   A.    Yes.

19   Q.    And was there also a discussion or an

20   agreement about Cara looking into other positions at

21   the hospital?

22   A.    Yes.   That's why we arranged for a typing

23   test.   Her typing speed upon hire was like 48, which

24   was under the requirement for some of the clerical

25   positions.

1    But there's always a potential that in, you

2 know, after so many years of employment and years of

3 keyboarding that you increase your speed, so we

4 thought she should take another typing test, and that

5 would possibly help her meet more of the

6 qualifications for a broader range of jobs.

7    Q.    Did you make arrangements for that test?

8    A.    Yes.  I contacted our employment staff and

9 made arrangements.

10    Q.    Let me ask you to look at Employer

11 Exhibit 29.

12    A.    Yes.

13    Q.    Could you describe what that document is.

14    A.    It was, actually, these positions, this is,

15 this is a memo from my, a fax from myself to Alan,

16 and this is possibly before I found out that there

17 was no bumping.

18    Because when I talked to Cara she said

19 maybe I could work in the MOB pharmacy or I could do,

20 like, the health services for senior citizen clerk

21 position.

22    I looked those up.  Those employees were

23 junior to Cara.  So this is possibly before I knew

24 that Michael had, Michael Chambrella had decided, had

25 given the opinion that there could be no bump in this

1  department.

2      Q.  So, after the meeting on April 2nd you

3  affirmatively looked for a position for Cara?

4      A.  Yes.  Well, because she said I think these

5  two positions look pretty good.  Then I went to, I

6  looked up their, the employees that were in the

7  position, I looked up their seniority date.

8          And I said well, in preparation you might

9  want to go talk to Deanna and talk, you know, take a

10  typing test and, and try to get going on these other

11  jobs that she might qualify for.

12     Q.  Let me ask you to look at Employer

13  Exhibit 30.  What is that?

14     A.  This was Alan, my recollection is that Alan

15  called me and he told me that she needed, that Cara

16  probably just needed more training.

17         And then so I reminded him that the

18  original trial period had ended on February 2nd, and

19  then it was extended to March 5th, and then again

20  extended to April 6th.  So that we had already a

21  couple of extensions.

22     Q.  Okay.  Could you look at Employer

23  Exhibit 31.  Now, What is that document?

24     A.  Okay, Alan had said that he needed, he

25  needed a definitive reason why Cara Loeser was no

62

1    Q.    Could you turn to Exhibit 45.  What is that

2    document?

3    A.    This is a letter from Michael Chambrella,

4    the Union's in-house attorney, to me, asking me if I

5    could forward a list of available positions to the

6    Union once again, because, I mean, well, I had done

7    that before.  You can see, he wanted another one, an

8    updated list.

9    Q.    Did you forward the updated list?

10   A.    Yes, I did.

11   Q.    Is that what appears in Employer Exhibit

12   46?

13   A.    Yes.  Two days later I forwarded a list to

14   him by fax.

15   Q.    And were those all the job postings that

16   were available at that time?

17   A.    Yes, minus the registered nurse positions.

18   Q.    Let me ask you to turn to Employer

19   Exhibit 47.  What is that document?

20   A.    In this document I let Alan -- it's an

21   e-mail from me to Alan Itomura letting him know that

22   effective the end of July, July 31st, 2001, Cara's

23   employment would be terminated unless she bids for

24   and accepts, is accepted to a position for which she

25   is qualified.

63

1      And she had exhausted all vacation benefits

2  on May 29, and from May 29 to June 31 I made my own

3  decision to keep her on personal leave because we

4  thought maybe we could identify something that she

5  was qualified for.

6      Q.   So you gave the Union a little over two

7  weeks' notice prior to her termination to make sure

8  that she had an adequate opportunity to apply for

9  other jobs?

10     A.   That's correct, because I wanted them to

11 know the clock was running, got to be aggressive,

12 we've got to be, you know, out there looking for

13 appropriate positions.

14     Q.   Let me ask you to turn to Exhibit 48.  What

15 is that document?

16     A.   This is a memo to me from Randy Oba, who is

17 a senior pharmacist and Ria Walz, who is a senior

18 dispensing coordinator.

19      And it's regarding Cara Loeser's, the

20 accommodations made for her at the time she, just

21 prior to her leaving the position of pharmacy

22 technician.  So it's kind of a snapshot picture of

23 her capabilities at that time.

24     Q.   And was Cara's position or was her

25 employment terminated July 31st of 2001?

64

1      A.    Yes, it was.

2      Q.    Let me ask you his --

3      A.    Oh, 2001, yeah.

4      Q.    Has St. Francis had financial struggles in

5   the last couple of years?

6      A.    Yes, it has.

7      Q.    And as a result of that has the work force

8   expanded or contracted?

9      A.    The work force has contracted

10  significantly.

11     Q.    And do you continue to look for areas to

12  minimize costs?

13     A.    Yes.

14     Q.    Is it accurate to say there's not an excess

15  of resources at the present time?

16     A.    There is absolutely no excess of resources.

17  We lost $22 million last fiscal year, and it's

18  estimated we will lose five to six at the end of this

19  fiscal year.  We are in the red, and we've made no

20  secret about that.  We've met with all of the unions,

21  all employees, to let them know what kind of trouble

22  we're in.

23          MR. MARR:  Thank you.  I have no

24  further questions.

25          ARBITRATOR:  Any?

79

1    that the Union's position was if Ms. Loeser was not

2    going to be reinstated to the admissions department

3    and given additional training, I'm giving the Union's

4    position, then what the Union wanted was her to be

5    returned to the pharmacy, is that correct?

6        A.    I understood that from his correspon --

7    Alan's correspondence.

8        Q.    During this time frame until Cara was, had

9    been let go as an admissions registrar clerk until

10   the time her employment was terminated on July 31st,

11   2001, Ms. Loeser continued to try and find work, try

12   and find a position at St. Francis, is that correct?

13       A.    Yes, she did look for positions.

14       Q.    She was unsuccessful?

15       A.    Yes, unsuccessful to locate other

16   positions, she could not locate a position.

17            MR. MARR:  I'm sorry, I didn't hear.

18       A.    She could not locate a position, because

19   we, the offer has always been on the table that we

20   would put her in whatever she found.  She found

21   something suitable we would give it to her, her

22   seniority wouldn't matter, departmental seniority,

23   everything would be operable, we would give it to

24   her.  But she couldn't find anything.

25   BY MR. KIM:

1      A.    No.

2      Q.    Who is Doctor Kaku?

3      A.    Doctor Kaku is my neurologist.

4      Q.    And why are you seeing Doctor Kaku?

5      A.    I was referred to him also by Doctor

6   Matsumoto because I had some problems with dizzy

7   spells, so I was referred to him.

8      Q.    Are you seeing Doctor Kaku in relation to

9   your multiple sclerosis?

10     A.    Yes.  He's my attending physician right

11   now.

12     Q.    Has Doctor Kaku ever told you that the

13   problems you were having with your feet were related

14   to multiple sclerosis?

15     A.    No.

16     Q.    Are you presently having any problems with

17   your feet?

18     A.    No.

19     Q.    Can you tell the arbitrator approximately

20   when you first started working for St. Francis?

21     A.    I started at St. Francis May 21st, 1990.

22     Q.    And what position did you first have when

23   you went to St. Francis?

24     A.    Pharmacy technician full-time.

25     Q.    And what did you do generally as a pharmacy

1    tech?

2        A.    I had read doctors' orders, okay, and after

3    the doctors' orders prepare a patient profile with

4    their information and the medications written by the

5    doctor.   Then it's checked by the pharmacist to make

6    sure that the directions of the patient's

7    instructions are correct and medications that's

8    posted to the profile is also correct.   And from then

9    on we fill our med bins.

10       Q.    There has been some testimony regarding

11   certain accommodations that were made for you in

12   1999-2000 regarding your, the job duties that you had

13   to perform.

14            Do you recall that testimony about the

15   accommodations that needed to be made?   Back here.

16   Let me show you Exhibit 48, which is a memo prepared

17   by Mr. Oba and Ms. Walz.

18            In here they talk about certain

19   accommodations that they made regarding various job

20   duties.   Did they make accommodations for you?

21       A.    Yes, they did.

22       Q.    At any time did Doctor Oba or Ms. Walz tell

23   you that you could not perform the duties of a

24   pharmacy tech with the accommodations that were given

25   to you?

1    A.    No.

2    Q.    At any point in time did Mr. Oba or Ms.

3  Walz tell you that if you continued to perform your

4  job in the same manner that you would be terminated

5  because you were not performing the duties of a

6  pharmacy tech?

7    A.    No.

8    Q.    At some point in time you moved from the

9  pharmacy to admissions, is that correct?

10    A.    Yes.

11    Q.    Why did you move there?

12    A.    Number 1 was I was approached by Doctor

13  Randy Oba on several occasions regarding my

14  disability, and his concerns were mainly the fact

15  that they were, that I, they didn't want me to be a

16  liability to the pharmacy, and another one was my

17  future, to think about because of my further

18  progression and other future that I need to look

19  into.

20    Q.    When you transferred over to or planned a

21  transfer over to the admissions department, did

22  anybody from St. Francis, from management, tell you

23  that this was going to be a permanent transfer and

24  you would lose your right to return to the pharmacy

25  in the event things didn't work out?

108

1    that was their way, their way, their knowledge.  When

2    I tried to explain to them that it was really my feet

3    that needed healing, needed time of recovery, and it

4    wasn't related to any of my symptoms of MS.

5         Q.    Well, who did you tell that to?

6         A.    I told that to Doctor Randy Oba and I also

7    explained that to Ria.

8         Q.    Who in Susan's department did you tell that

9    to?

10        A.    No one.

11        Q.    Isn't it true that pharmacy eliminated the

12   surgery and anesthesia Pyxis units from your work

13   load?

14        A.    Yes.

15        Q.    Isn't it also true that you were excused

16   from delivering unit dose carts to the floors?

17        A.    Yes.

18        Q.    Isn't it also true that pharmacy changed

19   your duties to include more charging functions than

20   other pharmacy techs performed?

21        A.    Yes.

22        Q.    And isn't it true that the charging

23   functions are less onerous than the other duties of a

24   pharmacy tech?

25        A.    Less?

109

1      Q.    Onerous, less difficult.

2      A.    Yes.

3      Q.    It's easier to do the charging duties,

4   isn't it?

5      A.    Yes.

6      Q.    Isn't it true that you were given a fixed

7   work schedule while the other pharmacy techs rotated?

8      A.    Yes.

9      Q.    Isn't it also true that you were given

10   fixed days off while other pharmacy techs had their

11   days off rotated?

12      A.    Yes.

13      Q.    And your fixed days off were Saturday and

14   Sunday, correct?

15      A.    Yes.

16      Q.    And the reason that you had fixed days off

17   was for your medicine regimen, correct?

18      A.    Yes.

19      Q.    That you would take the medicine on an

20   evening and then needed two days off after you took

21   medicine, correct?

22      A.    Actually, it was just for 24 hours.

23      Q.    Why then did you have two days off in a

24   row, two fixed days off in a row?

25      A.    Well, my original position as I'd bid for

110

1    that back in '93, it was, it was five days, Monday

2    through Friday, with every weekend off.  And I guess

3    throughout those years until Robbie Robot was

4    installed, medication, medication dispenser, that

5    schedule remained the same.

6        Q.    I understand that, but when Robbie the

7    Robot was installed, didn't that change the work

8    shifts of the pharmacy techs?

9        A.    Yes, it did.

10       Q.    It required some adjustments, correct?

11       A.    Yes.

12       Q.    But your schedule was not adjusted,

13   correct?

14       A.    No.

15       Q.    Is that correct?

16       A.    Yes, it was, it was remained the same.

17       Q.    And the reason it remained the same,

18   because you provided a disability certificate that

19   said you needed to be on a fixed schedule?

20       A.    Yes.

21       Q.    And St. Francis accommodated you?

22       A.    Yes.

23       Q.    And wasn't the reason for that

24   accommodation so that you could have two days off

25   after you took your medicine?

1        A.    Can you repeat that again?

2        Q.    Wasn't the reason that they gave you

3    Saturday and Sunday off so that you could have two

4    days off after you took your medicine?

5        A.    Not to my knowledge for, just for the

6    medication regimen.

7        Q.    Well, why then did you need an

8    accommodation of having Saturday and Sunday off?

9        A.    I didn't really request for Saturday/Sunday

10   off.  My schedule just remained the same as was.  You

11   know, they didn't really say, it wasn't really

12   changed to the point where I would still be working

13   some days and have, like, Friday or Saturday off, it

14   just remained the same.  There was no discussion if

15   it was all right to change it to these days off.  It

16   just, it was, it just remained the same.

17       Q.    Isn't it true that everybody else's

18   changed, all the other pharmacy techs, their

19   schedules changed, right?

20       A.    Their schedules changed.

21       Q.    And wasn't there a meeting with the Union

22   where the Union said everybody's shift is going to

23   change, and then St. Francis said wait a minute, she

24   needs an accommodation, Cara needs an accommodation,

25   isn't that correct, isn't that what happened?

112

1          A.    Yes.

2          Q.    And the accommodation was because of the

3    disability certificate that you submitted, right?

4          A.    Right.

5          Q.    Isn't it also true that St. Francis

6    permitted you to not lift any heavy boxes as an

7    accommodation?

8          A.    Yes.

9          Q.    You had a lifting restriction of, you

10   weren't supposed to lift anything over 20 pounds,

11   correct?

12         A.    Yes.

13         Q.    And other pharmacy techs had to do that,

14   correct?

15         A.    Yes.

16         Q.    And did you ever tell St. Francis that your

17   need for this accommodation was not because of MS but

18   was rather because of plantars fascitis?

19         A.    Yes.

20         Q.    Who did you tell that to?

21         A.    I had told that to Ria Walz and Doctor

22   Randy Oba.

23         Q.    Did you ever tell anybody in Susan's

24   office?

25         A.    No.

113

Q.    Isn't it true that you experienced
dizziness on-the-job?

A.    Yes, I did.

Q.    Was that due to MS or was it due to
plantars fascitis?

A.    My multiple sclerosis.

Q.    Isn't it true that other pharmacy techs
were displeased because they had to pick up the slack
of the work that you were not doing?

A.    I'll say yes, although they, it wasn't
shown to me or wasn't even -- I wasn't confronted.

Q.    Isn't it true that you're the one that
sought, that said that you wanted a clerical
position?

A.    Yes.

Q.    You testified that once you went to
admissions that you were not aware of concerns about
your performance, I think you testified, in the
beginning.  When did you become aware that there were
concerns about your performance?

A.    When I was approached by fellow admission
registrars.

Q.    When was that?

A.    During my training.

Q.    I believe you started on December 4th,

1  correct?

2      A.    December 4th, yes.

3      Q.    At what time did your fellow admission

4  registrars approach you and indicate that you were

5  having difficulty?

6      A.    I'll say it was within the four weeks, at

7  least before January of 2001.

8      Q.    Did you seek additional training when they

9  indicated you were having problems?

10     A.    Yes, I did.

11     Q.    Who did you ask?

12     A.    I, I asked one of the admission registrars

13  who was more on an experienced level to guide me in

14  questions that I had concerns and needs of.

15     Q.    And were they cooperative?

16     A.    Yes, they were.

17     Q.    You stated that you wanted to return to the

18  pharmacy when it became apparent that it wasn't going

19  to work out in admissions.  Did you ever tell Susan

20  Hashimoto that?

21     A.    No.

22     Q.    You did have conversations with her where

23  she tried to show you other opportunities that might

24  be available in the hospital, isn't that correct?

25     A.    Yes.

115

1    Q.    And during none of those conversations did

2    you tell her that what you wanted to do is to go back

3    and be a pharmacy tech?

4    A.    No, I didn't mention that.

5    Q.    You told St. Francis at least by the fall

6    of 1999 that you had been diagnosed with multiple

7    sclerosis, is that correct?

8    A.    Yes.

9    Q.    Did you tell them that Doctor Kaku was your

10   treating physician for that condition?

11   A.    Yes.

12   Q.    Who did you tell that to?

13   A.    I had told my assistant director of

14   pharmacy services.

15   Q.    Who is that?

16   A.    Terry Ann Leong.

17   Q.    But when you were having meetings with

18   human resources and with the Union, did you tell

19   Susan Hashimoto that?

20   A.    Can you repeat that again?

21   Q.    Yes.  You had numerous meetings with the

22   Union and with Susan Hashimoto about your job

23   performance as a pharmacy tech, correct?

24   A.    Yes.

25   Q.    During those meetings did you disclose that

118

1          MR. MARR:  Oh, I agree.  But I think

2   he should to ask the questions rather than prepare

3   her for her testimony.

4          MR. KIM:  Okay, I have nothing

5   further.

6          ARBITRATOR:  Nothing further.

7   Anything further of this witness?  If not, the

8   witness is excused.

9          MR. KIM:  The Union rests.

10         ARBITRATOR:  The Union rests.

11         MR. MARR:  Could I have a brief

12  recess?

13         ARBITRATOR:  Sure you can.

14  (Break taken from 1:35 p.m. to 1:53 p.m.)

15         ARBITRATOR:  On the record.  Recalling

16  Susan Hashimoto.  You're still under oath.

17         WITNESS:  I understand.

18         ARBITRATOR:  Let's proceed.  On the

19  record.

20         MR. MARR:  Thank you.

21             SUSAN HASHIMOTO,

22     having been previously duly sworn,

23     testified upon her oath as follows:

24         REBUTTAL DIRECT EXAMINATION

25  BY MR. MARR:

125

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII              )

 3                                )  SS.

 4   CITY AND COUNTY OF HONOLULU  )

 5

 6           I, DENNIS J. YANKEE, do hereby certify;

 7           That on June 26, 2002, at 9:26 a.m.; that

 8   the foregoing proceedings were taken down by me in

 9   machine shorthand and were thereafter reduced to

10   typewritten form under my supervision; that the

11   foregoing represents to the best of my ability, a

12   true and correct transcript of the proceedings had in

13   the foregoing matter.

14

15           I further certify that I am not attorney

16   for any of the parties hereto, nor in any way

17   concerned with the cause.

18

19           DATED this 28th day of June, 2002, in

20   Honolulu, Hawaii.

21

22

23

24   _____

25   DENNIS J. YANKEE, CSR 285
```