1    I just want to understand what you're telling me.

2    A        Okay.  On the morning stocking there were areas

3    where there were immediate, there were immediate

4    requests for there's a need for like a -- I'll use an

5    example like a transplant.  There's like a liver

6    transplant.  Oh, my gosh, there's a lot of restocking,

7    there's a lot of glass meds to deliver at a certain time

8    of the evening.

9            So those were areas where there -- areas where

10   times, if there's an afternoon technician and having --

11   and the meds were already properly delivered at a

12   certain time, then if there is like a transplant going

13   on, or two transplants going on, this is where they had

14   requested some assistance of the afternoon technicians

15   to do the prepping of a transplant kit.  So when I come

16   in at 2:30 and say that, okay, Cara these are the things

17   that need to be delivered at a certain time.

18           So if it required areas where I could deliver it

19   on a timely basis early before the shift leaves for the

20   afternoon it was all right.  But there were times where

21   if it -- if we were really just so overwhelmed with

22   prescriptions and the doctors are requesting for heavier

23   glass medications and so forth, there are times where I

24   knew I could do the job, but there were times where the

25   attacks had suddenly just happened, you know,  without

1    my knowledge and areas where I would have to tell them,

2    you know, I would need assistance, So can you please ask

3    the transporter to come down and deliver these meds for

4    me.

5              Those are areas where I already was aware that

6    it was frustrated moments for a pharmacist where, no,

7    Cara, you need to understand that when we have these

8    transplants you need to be aware of the situation.  And

9    it's like, well, you know, there's just a technician at

10   night, which is me, and just the night pharmacist, you

11   know, and I do my best.  If there's something that needs

12   emergency delivery I can do it.  But if there's

13   something that happens to me also this is where I need

14   some accommodation or I need an assistant.  Or this is

15   what happened while there was a delay.  But there are

16   incidents where that happened.

17   Q        And did they accommodate you in that regard

18   by --

19   A        To be -- I recall no, I was not accommodated.  I

20   remember delivering medications where I had slipped even

21   in OR.  I'm not sure if that's on report too.  You

22   should have a copy of that.  And they had to ask for

23   another pharmacist to come in or either a pharmacist to

24   stay back to do the work of -- to do my work because I

25   had -- I was in ER being treated for a slip of water

1    that fell on my -- where I fell on my whole entire back

2    side and I had to get carefully observed for like four

3    hours.  Four hours of that time.

4         Where I started to sense that pharmacists had

5    already said, you know what, she -- we need to really

6    resolve this issue.  I mean it was a really serious

7    issue from the time of my diagnosis in 1999 until I made

8    the decision to bid for that admissions position and

9    really started December of 2000.

10   Q     When you say it was a really serious issue what

11   do you mean?

12   A     Serious issue where comments were made by

13   technicians that, you know, we need to hire someone else

14   or we need extra, you know, they needed help.  Because

15   Cara can't do a certain responsibility as she could do

16   it before.  But now, you know, it's kind of -- it's more

17   of a burden for her.  In their eyes it was a burden to

18   me.  In their eyes.  But for me it was I can do this but

19   I also need the assistance of someone else just for that

20   time being.  But to them it was impossible.  Even for

21   45 minutes of my time with the -- with that extra help

22   it was a hardship for them.  It was -- to be truthful it

23   was a hardship.

24         In the pharmacy it's -- it's a very strenuous

25   operation.  If you don't have sufficient help it can be

1   a liability.  The pharmacists needed to see it that way.

2   But I guess because budget again, budget cut and enough,

3   just enough workers.  I don't have any other

4   explanations behind that other than budget and enough

5   workers for the shifts.

6   Q        One final area back at the pharmacy.  You talked

7   about rotating.  As I understand it that you did not --

8   that you did not rotate.  Was it that you didn't rotate

9   shifts or didn't rotate days?

10  A        That's a good question.  Rotating shifts are

11  like where from one week, as I said, you'd be working,

12  for example, there's a 7 a.m. to 4:30 shift.

13  Q        Okay.

14  A        And then there's a second shift that comes in

15  12:30 to 9:00.  And then the next shift would be, which

16  was my shift, 2:30 to 11:00 or 2:30 and carrying over.

17  Because there were days I would work 2:30 p.m. to 2:30

18  in the morning.

19           That's -- I mean there were serious issues of

20  that sort where I did accommodate those areas to relieve

21  the 7:00 a.m. shift.  So if I stayed until 2:30 a.m. at

22  least it would give relief of extra work as the shift

23  comes in at 7:00.  There's less paperwork and less meds

24  to fill to add to the rest of the cart of their normal

25  deliveries.

1    And then what, and also their delivery times had

2  changed.  We used to deliver our meds at 9:00 a.m. in

3  the morning and then I guess when they had installed

4  that Robby Robot, that robot where it filled patient

5  meds, but that depends on who's operating of that, which

6  pharmacist, approving it right there.  They had changed

7  to the afternoon delivery.

8  Q    I thought I recalled somewhere in the papers

9  that said that the other workers in the pharmacy were

10  subject to rotation but that you weren't because of your

11  disability.  Do you know what I'm talking about there?

12  A    It was the description of the responsibilities

13  of that shift that I wasn't able to do because of my

14  symptoms.  I mean I've tried pushing that cart by myself

15  and I had an injury.  So it was like, you know, I can do

16  the job but if someone can help me pull it and I push

17  and if they can just, you know, stay there while I do

18  the med exchange.

19    But in -- in the -- I guess for the pharmacist

20  on duty it was impossible.  Because we need that

21  technician down, Cara, we need that technician to

22  accommodate in the unit dose room.  I mean that anybody

23  working for a hospital pharmacy from my experience of

24  ten years it is a -- it requires additional help.  You

25  cannot, in my eyes, as I observed during those years,

1    four technicians is not sufficient.  And with that Robby

2    Robot they would need at least two more technicians

3    because you also had added responsibilities where you

4    unit dosed medications.  So we also have to do those

5    unit dose seals and make sure that everything was done

6    on a sanitized situation and pharmacist checking each

7    medication that everything is sealed, the dates were

8    done.  You know, those are a lot of responsibilities

9    and...

10   Q    What was the shift that you couldn't work?  Was

11   it one of the three shifts or was it a day that you

12   couldn't work?

13   A    It was actually the responsibilities assigned on

14   that shift that I know that I could do it, but again I

15   would need an assistant like just for those couple

16   minutes.  But it wasn't -- it wasn't in their budget to

17   have someone assist me.

18        Other than that it wouldn't have -- it should

19   not have been -- it should not have happened that way.

20   If they had, you know, not made those comments or not

21   areas where, you know, we have -- we have to have this

22   unit dose meeting because of Cara.  Everything was

23   because of me and trying to work around my

24   accommodation.

25        Which is the reason why I told myself, no, I'll

1    accommodate, I would do this accommodation, not for

2    them, but for me, by applying for that admissions, and

3    also complying with the request of the human resource

4    manager.  Of course they will tell -- they will say we

5    did not suggest or try to push Cara out of the pharmacy.

6    That's -- those statements were made in the past.  You

7    know, we did not ask her to leave us.  We only asked her

8    to accommodate to a suitable position and liability.  So

9    there's, I mean when you think about it, it's still

10   requesting that I, you know, exit pharmacy, but more

11   because of disability.  For their protection and my

12   protection.

13   Q        Now, when you were down in admissions during the

14   time that you were down there did you ever feel that

15   your disability made it more difficult to do your job?

16   A        On the mental part?  You know the mental part?

17   Q        All right.  Let's break it down mental and

18   physical.

19   A        The way I was treated there until the correct --

20   I guess when we resolved it.  In the beginning when I

21   first started admissions the girls, it was mainly all

22   girls, they all thought that multiple sclerosis was

23   similar as HIV.  Which was why I was treated like a --

24   the way they treated me was like why is everyone

25   training me and really a distant apart?

1    job.  And I'm going to ask the physical ability to do

2    the job.  So let's take the first part.  Did you feel

3    like your disability affected your mental ability to do

4    the job in admissions?

5    A        In the beginning when I was -- when you say

6    mental, meaning areas where I'm doing something and I

7    can't recall how I did this error or?  There were --

8    there were incidents where there was an error.  And I

9    told them that I don't recall doing this error.  But

10   other than how I was told to do it this way that's all I

11   can remember.

12            But as far as when you say mental status there

13   are areas where I was aware that things were like

14   happening to areas where I'm looking at a -- at a

15   patient's demographics, for instance, and at that moment

16   I would ask myself how did I again get into how -- I

17   don't recall sitting down at that moment.  And at that

18   moment I have this patient's demographics in front of

19   me.  There are incidents where I can't recall how it was

20   delivered to me or did I pick it up or did I walk from

21   that area of the front of the admissions department to

22   this cubicle here?

23            There were incidents where I did share that with

24   the supervisor and again they termed it as mental

25   status.  So I'm like wondering mental status?  Which I

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES

1   didn't find out until months later that I was described

2   as mental status.

3           So I don't know if it was their own way of

4   describing a mental status from disabilities or mental

5   status because they were just, they didn't have that

6   understanding.  From my interpretation.  Which is why

7   the reason I was placed on vacation and not able to do

8   the work that was really of that responsibility.  I mean

9   not according to their requirements.  Their requirements

10  or, as I said, the admissions requirements.

11  Q       Were there any physical requirements of the job

12  in admissions that you could not perform because of your

13  disability?

14  A       Yes, their physical?  Can you repeat that

15  question, because I --

16  Q       Yes.  Were there any physical requirements of

17  the job in admissions that you could -- felt you could

18  not do because of your disability?

19  A       To my knowledge up to this point I don't recall

20  anything physical other than the normal duties of a

21  clerical type position where you sit down a lot and work

22  on a patient's demographics or call patients at home to

23  remind them of their appointments or update their

24  records.

25          Other than numbness or heaviness from sitting in

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          108

1    A       Yes.

2    Q       Okay.  I'll just ask you if at any point in fact

3    you don't want to continue just say I'd like to stop and

4    we'll make arrangements.  Okay?

5    A       Sure.

6            MR. VARADY:  Richard, I think that Cara wanted

7    to clarify one of her answers from yesterday as we start

8    today.

9    Q       (By Mr. Philpott) Sure.  Please do.

10           MR. VARADY:  It was in response to your question

11   about paragraph 14 --

12           THE WITNESS:  14.

13           MR. VARADY:  -- in the complaint.  Because I

14   think the record would show that she said that,

15   something to the effect that Ms. Hashimoto did not tell

16   her that information.  And she wanted to clarify that

17   for you.

18   Q       (By Mr. Philpott) Go ahead, please.

19   A       The question regarding paragraph 14 if I was

20   informed of -- I don't have that document in front of

21   me.

22           MR. VARADY:  I'm handing Ms. Loeser Exhibit

23   No. 4.

24           THE WITNESS:  Paragraph 14, "That Ms. Loeser was

25   told by St. Francis Medical Center's employee relations

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    111

1   certificate from Dr. Chun, is that right?

2   A       Yes.

3   Q       And I believe that Dr. Chun is a podiatrist?

4   A       Yes.

5   Q       I will represent to you that this is the

6   earliest memo that we -- that I could find about your

7   ability to work that relates to your current condition.

8   Do you recall any earlier notes from Dr. Chun or any

9   other doctor before 11/8/99 concerning your inability to

10  work due to MS?

11  A       No, I don't recall any other doctor's notes

12  other than this current one that I'm looking at dated

13  November 8th, 1999.

14          MR. VARADY:  And just for the record it refers

15  to a foot condition and not to MS.  So to that degree

16  I'd just like to clarify that that's the memo we're

17  referring to, the 11/8/99 Dr. Chun memo referring to the

18  foot condition.

19          MR. PHILPOTT:  Correct.  That is what the

20  document says.

21  Q       (By Mr. Philpott) Now it says "It is recommended

22  that patient continue her usual light duty and job

23  specifications in the evening."  Were you, as a result

24  of that were you continued in light duty?

25  A       Yes.

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          113

1    A        Yes.

2    Q        Okay.  What does that mean to you?

3    A        Because it just states "Do not rotate Cara at

4    this time" I -- I'm not able to interpret this.  I could

5    only assume that she may have meant, which is Miss Susan

6    Hashimoto, that not to rotate either my shift or rotate

7    our responsibilities.  Because as I had mentioned

8    earlier during the shift there's different description

9    of our job specs.

10   Q        And I, despite having asked you this a number of

11   times yesterday, I'm still confused about this rotation.

12   I thought you testified yesterday that you were not

13   rotated through shifts as other pharmacy personnel were?

14   A        Technicians.

15   Q        As other technicians were, is that correct?

16   A        Yes.

17   Q        So in other words, you, you would stay on the

18   same shift when other technicians might go to an evening

19   or a night shift, is that correct?

20   A        More like day shift to afternoon.

21   Q        And what were the hours of the shift that you

22   were retained on?

23   A        It was evening, evening shift, which was 2:30

24   p.m. to 11:00.

25   Q        And did you understand that this, that retaining

1    you on this 2:30 to 11:00 shift was an accommodation so

2    that you would not rotate, have to rotate through other

3    shifts?

4    A        I would say no.  Because it was mainly the

5    description of my accommodations of the duties of the

6    evening technician to -- they did accommodate for those

7    areas without having to create more, another position

8    which has to be okayed by the union.

9    Q        But the other pharmacy techs were required to

10   rotate and you were not, is that correct?

11   A        Yes.

12   Q        All right.  And why were you not required to

13   rotate when others were?

14   A        It was my answer would be to -- for the duties

15   to accommodate whatever responsibilities that I was

16   capable of doing.  And some that were limited because

17   of, like I said, liability.

18            I had accidents in the past where I had

19   shattered expensive IV jars.  Glass.  And those were

20   things that we had to modify, if there's heavy items to

21   carry do not handle heavy items, you let the transporter

22   put those in.  You just put it on a light cart but don't

23   touch anything else.  Those are things that I was

24   accommodated to be aware of.

25            Any further issues where it may be liability and

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES        115

1    to prevent any injuries and possible areas where I may

2    not be able to identity why I had this other injury that

3    I was not aware of.

4    Q        And when you said this other injury you were

5    pointing to your right shoulder and right side?

6    A        As I mentioned before yesterday I have -- I have

7    areas of my body that I am not able to feel.  Right now

8    unless I really go with fingertips, you know, I would be

9    able to identity to the neurologist where, you know, I'm

10   not able to feel, or if I'm not responding I would just

11   stay still, or if I feel something I would automatically

12   twitch because at least there's some sensation on some

13   various parts of my body on this right side.

14   Q        And were you experiencing those kind of

15   sensations back in November of '99?

16   A        The sensations was -- it really happened on odd

17   areas of my body, like maybe middle part of my arm all

18   the way to my hand.  And the middle part of my thigh.  I

19   mean those were areas where I started to feel like,

20   gosh, you know, I'm having these unknown experiences

21   that I've never had before where I would require to hang

22   on on the left side or try to catch myself from even

23   falling left or back.

24   Q        And -- I'm sorry.

25   A        No.

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    116

1  Q        And this was occurring while you were still in

2  the pharmacy tech position?

3  A        Yeah, it was just gradually building on, as I

4  said, parts of my body.  And I wasn't aware of the

5  symptoms other than in the beginning thinking that it

6  was a nearby stroke or aneurysm.  Because normally when

7  a part of the body starts to react and the vision it's,

8  you know, rather than playing, diagnosing myself, I

9  had -- it was serious where I had to get an MRI.

10  Q        Let me show you the next exhibit.  And this is

11  another disability certificate.  This is Exhibit 6.  And

12  this appears to be another or looks like another

13  disability certificate.  Do you recognize it?

14        And I note that there are two copies that look

15  like a similar document, but I gave you both copies

16  because the second one has some scratch out in one

17  column and the first one appears to have white out.  And

18  that's in the full column.  And that's why I gave you

19  both because I'm not sure which you're familiar with.

20        So let me go back and ask do you recognize it?

21  A        Yes, I do.

22  Q        Okay.  And was this again another slip from

23  Dr. Chun?

24  A        Yes.

25  Q        Okay.  And it appears here that he is saying as

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          128

1              identification.)

2    Q        (By Mr. Philpott) Okay. Let me show you

3    Exhibit 12. And this is now a memo, looks like another

4    memo to you from Ms. Hashimoto. And ask again do you

5    recognize that?

6    A        I don't even recall this note either.

7    Q        So you don't recall seeing that before?

8    A        Huh-uh. No.

9    Q        Do you recall attending a meeting with pharmacy

10   management and your union representative?

11   A        Yes, I recall the meeting but I -- I don't

12   recall the dates of the meeting. It's so long ago.

13              (Deposition Exhibit 13 marked for

14              identification.)

15   Q        (By Mr. Philpott) Let me show you Exhibit 13.

16   Another disability certificate. And ask if you

17   recognize that?

18   A        Yes, I do.

19   Q        And is this another disability certificate from

20   Dr. Chun?

21   A        Yes.

22   Q        And it appears, or is it correct that on 8/16 he

23   recommended that you would continue with your light duty

24   restrictions for another four months?

25   A        Yes.

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    129

1    Q        And so four more months would take you into mid

2    December of 2000, is that correct?

3    A        Yes.

4    Q        Now, so at that point had you been on -- you'd

5    been on light duty since I think the first certificate I

6    showed you was 11/99.  Do you see that?

7    A        Yes.

8    Q        So had you been on continuous light duty from

9    11/99 through to the date of this note?

10   A        Your question?

11   Q        Yes.  Had you been continuously on light duty

12   since the date of November '99 to the date of this note?

13   A        Yes.

14   Q        Okay.  And you would continue on light duty for

15   four more months under this note, is that correct?

16   A        Yes.

17   Q        So you would, by December you would be on light

18   duty for about a little more than a year, is that

19   correct?

20   A        Yes.

21   Q        And was the light duty restrictions specified by

22   Dr. Chun honored by St. Francis?  Let me say it again.

23   Was the light duty restrictions in this note of 8/16/00

24   honored by St. Francis?

25   A        Yes.

1          (Recess taken from 9:56 through 10:03 a.m.)

2    Q       (By Mr. Philpott)  Okay.  Let's restart.

3    Ms. Loeser, are you okay to continue?

4    A       Yes.

5          (Deposition Exhibit 16 marked for

6          identification.)

7    Q       (By Mr. Philpott) Okay.  Let me show you

8    Exhibit 16 and ask you if you have seen it before?

9    A       Yes, I've seen this.

10   Q       Okay.  What were the circumstances under which

11   you saw it?  What were the circumstances under which you

12   saw the exhibit?

13   A       That this is a check off list on my duties and

14   training and these checkmarks are to indicate the

15   responsibilities that either that I will be trained on,

16   shown or if it was -- I'm not sure if this one was to

17   check, being checked off, was a -- I have already done

18   these duties for their own information or it was -- or

19   if it was -- or the description of this is just a

20   regular checklist of what my responsibilities are.

21   Q       Do you recall sitting down with someone and

22   reviewing this, this document?

23   A       Yes.

24   Q       Do you recall who that was?

25   A       No, I don't remember.

1   make any inquiry before you applied, you bid for the

2   admissions job, as to what your duties would be down

3   there?

4   A       I don't recall inquiring.  All I do remember is

5   I was notified by Ms. Hashimoto that there's an

6   admissions registrar opening.  And I don't remember the

7   dates, but I remember there was a two day of the

8   announcement of the bid.  And I do recall bidding for

9   that position.  Now I don't remember how I had -- if

10  there was a paper or so I don't remember the time of --

11  or when of that position that I had that bid to submit.

12  The only ones I remember is when I was called by Miss

13  Teresa Pytel to be interviewed.

14  Q       How did you find out what you'd be doing down

15  there?

16  A       I was informed by Miss Teresa Pytel.  And she

17  sat with me.  I remember -- I remember that first day of

18  being orientated with -- with the admissions manager

19  and she explaining to me, you know, this checklist here.

20  I do remember that.  And just going through, walking

21  through the admissions department and orientating me of

22  the responsibilities of an admissions registrar.  But

23  she did not go into like detailed areas of this is what

24  you're going to do.  She was not able to do that other

25  than as you asked other questions further down.

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                     138

1    Q        Okay.

2    A        But it wasn't directly to me.

3    Q        Right.  It's not.  It's actually directed to the

4    business agent there.  The first line says, "Cara

5    Loeser's trial period in the position of admission

6    registrar is ending on February 2, 2001."  Did you

7    understand that that was the case, that your trial

8    period was ending in February of -- on February 2nd of

9    2001?

10   A        No, I wasn't aware.  And I don't recall.

11   Q        What did you understand your trial period was

12   going to be?

13   A        Our union contract, and to my understanding and

14   knowledge effective of the date that I started would be

15   90 days.  So I would assume if I started December 4th of

16   2000, January, February, March, I would -- it would end

17   March 4th of 2001.

18   Q        Were you ever informed that your trial period

19   was extended from March -- from February 2nd to March

20   5th?

21   A        I don't recall.  I don't remember.

22   Q        Do you recall in the first two months after you

23   started were you informed in any regard about the

24   necessity for any improvement?

25   A        No, I don't recall I mean if there was an

COPYING PROHIBITED – HRS 606-13 AND OTHER COURT RULES          141

1  probationary period was being extended from February 5th

2  to March 5th?

3  A       I don't remember being told that other than as I

4  mentioned verbally of my responsibilities was not met

5  per their requirements.

6  Q       Did you -- your understanding is that you were

7  entitled to a 90-day probationary period under the union

8  contract?

9  A       Yes.

10  Q       And did you receive that 90-day probationary

11  period?

12  A       Yes.

13  Q       And what is your understanding as to why you

14  were not permitted to continue in the position in the

15  admissions office at the end of the 90-day probation

16  period?

17  A       My understanding is I wasn't able to perform

18  their required responsibilities in admissions for

19  St. Francis.  And although I did verbally tell them that

20  I was not properly trained I -- it was like something,

21  here, you do this type of example and that was it.  No

22  other sit down explanation or of the way the performance

23  should have been done.

24          And if I was orientated I was also orientated by

25  another admissions registrar.  And every admissions

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    142

1   registrar they have their own way of training or

2   orientating.  And the reason why I need to make sure

3   that I did mention orientate is because if I was to say

4   trained then I know that in our union contract the

5   person that trains has to be reimbursed.  And I know

6   those are areas where I know that it wasn't mentioned

7   so...

8              (Deposition Exhibit 19 marked

9              for identification.)

10  Q         (By Mr. Philpott) Let me show you Exhibit 19 and

11  ask if you've seen it before.  It's a letter from

12  Dr. Kaku to Dr. Matsumoto.  Have you seen that before?

13  A         I don't recall.  And I notice it's addressed to

14  Dr. Matsumoto.

15  Q         Dr. Kaku in that letter dated February 20th of

16  2001 says "I evaluated Ms. Loeser today.  For the past

17  two weeks she's had a heaviness and numbness in her

18  arm."  Do you recall being evaluated by Dr. Kaku in that

19  period?

20  A         I do remember being evaluated by Dr. Kaku.  But

21  as far as this date here, February 20, 2001, I don't

22  remember.

23  Q         It says under medications:  "Cara has been

24  taking the Avonex only every couple of weeks, sometimes

25  once a month, since October."  Is that accurate?

1   A       Yes, I remember having difficulty in remembering

2   about my weekly dose.  Yes, I do remember this.

3   Q       Do you recall during that period when you were

4   in the registrar's office having absences that were due

5   to your MS?

6   A       I remember an absence in admissions.  I remember

7   even having to go from St. Francis to -- to see

8   Dr. Kaku, but I don't remember the month.

9   Q       And what were the absences?  Why did you have

10  those absences?

11  A       I was experiencing unknown heaviness again on my

12  right side where I wasn't able to write.  I do remember

13  that.  And when I had answered the phone it had already

14  areas where I wasn't able to reach the pen because I

15  couldn't move.  And I was having problems trying to talk

16  on the phone and write with the left hand.  And there

17  was no one in the room with me.  We have a separate room

18  where we're like operators.  And there was no one with

19  me at that moment.

20          And I did notify Miss Teresa Pytel.  And I know

21  she wasn't -- I do remember she didn't feel pleasant

22  about it because she said someone had called in sick.  I

23  don't remember what month it was again and whatever

24  registrar that called in sick.  So I know it was really

25  a situation where I know that they were going to be

1  Q       So then is it your testimony that you only

2  worked, actually worked, in the admissions office for

3  December, January and February?

4  A       Yes, that's my recollection unless I -- if I am

5  misinterpreting I need to see documents.  As I said, I

6  don't remember dates or the exact date that I was -- met

7  with Barbara Fujimoto and Teresa Pytel and was verbally

8  told about my work performance and also having to be

9  reminded to clean out my locker.

10  Q       And did that, to your recollection, that was the

11  last day?  When you were told to clean out your locker

12  that was the last day that you worked?

13  A       Yes.

14  Q       And your recollection is that took place some

15  time in late February?

16  A       Or ending of February.

17  Q       Now after that time did you make any efforts to

18  find other positions at St. Francis?

19  A       Yes, I did.  I bid.

20  Q       And what did you do?

21  A       · I do remember calling St. Francis human

22  resources.  And I do remember Miss Carmen Aginoy who

23  handles our applications for the bargaining unit.  But I

24  don't remember what positions, although I do recall

25  bidding for some positions and being notified by a

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                147

1    letter that I was -- that the position was given to

2    someone, another qualified applicant.

3              (Deposition Exhibit 21 marked for

4              identification.)

5    Q        (By Mr. Philpott) I show you exhibit next,

6    Exhibit 21.  This again is a memo from Ms. Hashimoto to

7    the business agent.  Have you seen it prior to today?

8    A        Yes.

9    Q        And what were the circumstances under which you

10   saw it?

11   A        Can you be more specific?

12   Q        Yeah.  You said you'd seen it before?

13   A        Yes.

14   Q        When?

15   A        This fax here or you're talking about the job

16   descriptions?

17   Q        Well, let's just start with that.  This document

18   here had you seen it before?

19   A        No, I don't recall this document.

20   Q        At some point were you informed by the -- of the

21   job openings available at St. Francis after you were no

22   longer in the admissions office?

23   A        Yes.

24   Q        And who informed you of that?

25   A        I had -- I had kept in touch with St. Francis

1   accommodation is as I was placed on vacation from

2   admissions I wasn't accommodated back to my former

3   position in pharmacy.

4   Q       All right.  So the accommodation that you were

5   seeking was to be returned to the --

6   A       Pharmacy.

7   Q       -- pharmacy, which would have been were you

8   seeking to return to your previous position as a

9   pharmacy tech?

10  A       Yes.

11  Q       Okay.  At the time that you were in, still in

12  the pharmacy, in the pharmacy tech position, were there

13  any accommodations that you sought at that time that

14  were not given to you?

15  A       Yes, I do recall I did seek and requested with

16  the union representation, Mr. Bob Bruno, with a request

17  that a clerical position, being a bargaining position,

18  be created.  I do recall that now.  I don't recall the

19  date if we did meet and/or the month but I do remember a

20  meeting of suggestions.

21  Q       And this was while you were still in the --

22  A       In pharmacy, yes.

23  Q       And the accommodations that you were seeking was

24  that a clerical position in the pharmacy be created for

25  you?

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          157

1   bargaining position, her description was mainly dealing

2   with prescriptions, prescription calls and submitting it

3   to the billing department.

4   Q      All right.  So the position that you suggested

5   as an accommodation would really be a new position that

6   did not currently exist in the pharmacy?

7   A      Yes.

8   Q      Were there any other instances while you were in

9   the pharmacy of accommodations which you requested but

10  which were not granted?

11         MR. VARADY:  Well, I think that's been asked and

12  answered insofar as it relates to the request for help

13  with the cart.

14         THE WITNESS:  Oh, yes.

15         MR. VARADY:  That's my objection.

16         MR. PHILPOTT:  Okay.  I understand.

17         MR. VARADY:  So you can answer the question.

18  Q      (By Mr. Philpott) All right.  You made a

19  suggestion about a request for a cart, to assist with a

20  cart, is that right?

21  A      Yes, the cart, the medication cart.  That weighs

22  over ten pounds.

23  Q      All right.  And you were not able to handle the

24  medication cart because of your physical limitations, is

25  that correct?

1   A       Yes.

2   Q       All right.  Now, was that cart, I thought you

3   testified that you -- that where you took that cart had

4   been modified so that you did not have to go to certain

5   locations, is that correct?

6   A       Can you be more specific?

7   Q       I understood that your duties had been altered

8   so that you did not have to take the cart to certain

9   locations because it was too physically demanding, is

10  that correct?

11  A       Yes.  It depends on which medication cart.

12  There's a certain description of that.

13  Q       All right.  Explain.  Tell me.

14  A       There's the floor cart, the nursing station,

15  where technicians deliver.  Our medication cart holds

16  several bins.  Bin trays.  And it's, the cart is huge

17  enough to handle two floors, two to three floors.  And

18  so if it's really areas where there's a lot of

19  medications in each tray, because it depends on what the

20  description of the floors, like telemetry there's a lot

21  of heart medications could require a lot of glass IVs

22  also, which would add more weight to the cart, the big

23  heavy cart.  And there's also our smaller carts, which I

24  did use, and was accommodated for that area.

25          But my concern was where I wasn't able to do the

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                     159

1    med exchange where it required two to three different

2    floors.  It was really a problem where I did bring an

3    issue up where another technician may be injured.  And,

4    you know, it did happen but so much for that.  That's

5    another concern.

6              And so they did accommodate those technicians

7    because it was a day shift.  But as far as my evening I

8    did -- I was accommodated but there were times where

9    there was no -- if someone had called in sick, and if

10   the -- maybe there's some other leftover duties that

11   needed to be fulfilled, and I know that I wasn't able to

12   fulfill it because either I had other priorities, those

13   were areas where I had to ask for assistance.  And there

14   were lots of incidents of that where I wasn't really

15   assisted or accommodated.  But I don't recall again

16   which year was that and the -- the month that it

17   occurred.

18   Q         And what assistance or accommodation did you

19   request that was not provided to you?

20   A         The assistance where if my main responsibility

21   was to stay up front and collect all the medication RX

22   from the various floors, pull all the drugs and put it

23   next to the medication RX, which was priority.  And

24   there was like stats, now meds.

25              There were areas also where there was a big

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES     160

1  demand where maybe the Pixus, narcotic Pixus had to be

2  immediately restocked because there's a surgery going

3  on.  We had to -- I had to prioritize my decision on

4  which ones do I do?  I mean there's just the pharmacist

5  and me.  And when I, when I had to do what I did, just

6  certain parts of filling versus, oh, I have to go up and

7  repair that door of the Pixus up in OR or restock a

8  narcotic, please, you know, have this signed.

9         There are areas where I just wasn't able to get

10  that accomplished on a timely basis where I was already

11  lectured.  I would either be lectured or having to

12  document areas where this is what happened.  So I had to

13  do that.  There were certain documentations that I

14  remember documenting, and I don't have it with me

15  anyway, and letting them know that these have been

16  documented and brought to the attention.  And I did

17  mention to areas where if you folks require witnesses I

18  do have witnesses.  Which would be a nurse, where I

19  would ask her her name and let her know why it wasn't

20  delivered in time or, you know, on a timely basis or

21  what happened to it, why Cara's presence wasn't being

22  met when the narcotic Pixus door needed fixing or why a

23  narcotic wasn't being delivered on a timely basis.

24         Those are things that I did request for

25  assistance and accommodation.  But there it was either

1    if it was met it was being met with a person who was on

2    call or a person that wasn't able to show up in our

3    pharmacy.

4    Q        I'm just not clear about what accommodation you

5    wanted.  Did you want someone to come help you?

6    A        Help, yes.  Accommodation.

7    Q        And was your inability to meet those

8    requirements the result of workload or was it the result

9    of your disability?

10   A        Can you be more specific?

11   Q        Sure.  I'm trying to understand whether -- in

12   every job we have responsibilities we can't meet because

13   we're just too busy.  All right.  And, but, so I'm

14   trying to understand whether that was the situation in

15   which you required accommodation or whether you were

16   unable to do it and needed accommodation because of your

17   disability.  That's what I'm trying to understand.

18   A        It was mainly accommodations due to work staff.

19   And areas where I forgot that I, too, would have these

20   symptoms and not being aware to the areas where I would

21   grab anything and it would just shatter.  Because I

22   forgot that there was something that had happened and I

23   wasn't aware of it.  I was more concerned of having my

24   duties prioritized and making sure that Nurse So-and-so

25   on a certain floor, did you receive your meds?

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES

1  according to seniority.  And because we had technicians

2  who had second jobs it all looked at -- it was just

3  pointing at me.

4          And I did accept that position.  Although it --

5  it caused a lot of giving up family evenings and so

6  forth.  But my desires to work that shift was because I

7  actually just took that shift because of out of sympathy

8  for the evening pharmacist.  And then because I took

9  that shift I was granted the weekend.  But at the same

10  time not knowing as the years went by from '92 to '98 of

11  certain symptoms that I wasn't aware of until I'd been

12  diagnosed with multiple sclerosis in 1998.

13  Q       All right.  But if I understand your answer by

14  working in the evening shift, by granting you that

15  accommodation you did not have to deal with the heavy

16  medication cart on the day shift, is that right?

17  A       Yes.  But there were days I do recall where I

18  had to assist the technicians if they said, Cara, we

19  just need your help for 30 minutes, can you push and

20  we'll pull?  Those are really good wonderful

21  accommodations, two technicians pushing a heavy cart.

22  Q       And did that happen from time to time?

23  A       Yes, it did.

24          MR. PHILPOTT:  Might be a good time to take a

25  break.  Why don't we take ten minutes and then we'll

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    168

1    anything else.  That you've alleged that you were not

2    given reasonable accommodations, and I'm just trying to

3    find out if there are any other instances where you felt

4    you were not given reasonable accommodations while you

5    were in the pharmacy?

6    A       Some of the accommodations would be there was --

7    it was getting difficult to reach for medications.  And

8    if it was -- if I wasn't able to reach it there were

9    areas where they did accommodate with a footstool.  I

10   remember having those incidents where I wasn't able to

11   reach.  Those are things that I now recall.

12           Or if there's check off lists on the -- on the

13   certain RX or notation I needed to make I would have to

14   verbally let that person know at the moment, could you

15   write it for me because I'm not able to do it?  Those

16   things were accommodated.

17           But if -- there were incidents, too, where in

18   the evening I -- where I did experience a lot of

19   symptoms.  Symptoms of either areas of weakness on the

20   right side where they were like so happened just

21   burdened with lots of prescriptions where we needed help

22   and there was -- there were no other help.  So there was

23   areas where work would be just so -- done on slow areas

24   and not sent on a timely basis.

25           And I remember being -- I remember asking for

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES    169

1   accommodations for that.  That was because of areas

2   where I did realize that I'm not able to really fulfill

3   the duties as I could if it wasn't for all my symptoms

4   that just attacked.  And it was -- it attacked any time.

5   It was not where I was aware it's going to happen at

6   2:30 or where I was aware that it's going to happen at

7   this time.  It just attacked.  And I did ask for

8   accommodations where, you know, I would appreciate some

9   assistance because I cannot predict when an attack or

10  symptom will happen.  Will occur.

11  Q       And did you -- what accommodations were you

12  seeking when those attacks or symptoms occurred

13  unexpectedly?

14  A       Seeking especially for filling doctor's orders

15  as far as 16 medication orders came down at the same

16  time and there's like two to three meds to fill.  And if

17  I do ask for help someone will be telling me but I have

18  to get this other responsibility done.  So it was like,

19  okay, I already made a request.  I'm not going to -- I

20  only did what I could do.  And if there was like

21  complaints then we would have to have a meeting for

22  that.

23          And that's what created hostile environment.  It

24  was gettng to the point where this -- this project was

25  not completed because somebody was not able to do it

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          170

1  because this person was not feeling well.  And that was

2  the truth.  I mean it's unpredictable what I had gone

3  through.

4  Q        In your experience at the pharmacy was it the

5  case that unexpected emergencies did arise from time to

6  time?

7  A        Yes.

8  Q        And I presume that they were -- you just

9  couldn't predict?

10 A        Yes, no prediction.  I mean there were incidents

11 where I would come in at 2:30 and then I wasn't even, I

12 have not started work and I'm -- I'm not able to feel.

13 Or areas where I had to just sit down and as though I'm

14 not doing anything.  But I try to tell people I'm having

15 problems.  And there were times where I wasn't able to

16 say it so I have to use hand motion.  I do recall those.

17        And I'm not sure how the rest of everyone has

18 had a reaction to it, other than comments made or like

19 gossips that I -- that I know that it was said and I

20 wasn't even addressed.  Other than people having a

21 negative attitude towards the situation of my

22 disability.

23        MR. VARADY:  Excuse me, counsel, I just was

24 going to ask, I didn't want to interrupt but I was going

25 to ask for a clarification.  Were you referring to

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES
171

1   emergencies regarding Ms. Loeser's disability or

2   emergency orders to the pharmacy for pharmacological

3   needs?  I couldn't tell from your question which it

4   was.

5           MR. PHILPOTT:  Actually I was asking the second.

6   So let me clarify.

7   Q       (By Mr. Philpott) I appreciate your answer

8   although let me ask it slightly differently.  Were there

9   emergencies that occurred in the pharmacy because of the

10  nature of the work?  In other words, were there

11  emergency requests for prescriptions and that kind of

12  thing that were unpredictable?

13  A       Yes.

14  Q       Okay.  And whenever those occurred were you

15  limited to whatever staff was there at the time?

16  A       I would be limited if -- if a symptom had

17  occurred.  So, and as I said, my symptoms could just

18  happen without my knowledge until I'm not able to really

19  move.  I mean it's already happened so...

20  Q       Ms. Loeser, I can say that I intellectually

21  understand your frustration with your medical condition

22  but I cannot begin to understand it emotionally.  But I

23  say that because in your view when you were there in

24  that pharmacy at that time subject to these unexpected

25  symptoms that you could not predict what kind of things

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES        172

1  could have been done to provide for patient safety and

2  protect you?  Or what kind of accommodations could have

3  been done given that your symptoms were unpredictable

4  and unexpected?

5  A        Oh, accommodations you mean?

6  Q        Yeah.

7  A        I would notify especially the pharmacist, the

8  professionals, not the technicians, that I'm having a

9  problem and the -- if it's work required of the

10  pharmacist.  Because a lot of it that required the

11  pharmacist to approve before it was medications being

12  sent, for an example, it was done by the technician.  So

13  pharmacist was actually in their job description was

14  we're only here to check off.  You folks are the ones

15  that fill and type labels and all that.

16          But there were situations where if I'm going to

17  do a typing of a label and my fingers are already just

18  temporarily no sensation then I would let them know.

19  And I did have some accommodations, but of course if

20  pharmacists are also busy with answering doctor's

21  requests or other immediate attention then that -- that

22  would have had to been more prioritized.  Meaning this

23  is priority or whatever needs, there's a transplant

24  going on, we needed to prioritize.

25          So there were -- there were those evenings where

COPYING PROHIBITED – HRS 606-13 AND OTHER COURT RULES       173

1   everything was not prioritized and where we had big

2   complaints or areas where supervisors and pharmacists

3   had to meet because something had happened where it was

4   actually the responsibility of the pharmacist.  But it

5   again would be reflecting on the technicians because

6   that was the job description itself.

7   Q       Is it fair to say that there was no way that you

8   could predict the onset of your symptoms?

9   A       Yes, there was no way I could predict it.  I

10  mean, and these people knowing that they're

11  professionals themselves are being judgmental on me.

12  Like, you know, this is what's going to happen to a

13  person with multiple sclerosis.  Like areas where I was

14  told in two years I'll be crippled.  That statement was

15  made.  That pharmacist is not there today.  Or

16  situations where their own comments are made and I'm

17  like, you know, everyone's disability or illness varies.

18  You know, it varies.

19  Q       Is there anything that you think that

20  St. Francis could have done to accommodate the fact that

21  your symptoms were entirely unpredictable?

22  A       As I mentioned earlier, yes, when we did suggest

23  clerical duties, which was a creation that's pertaining

24  to pharmacy and not the billing department.  I mean for,

25  you know, in case you're wondering there is -- there was

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES        174

1  a pharmacy clerk but it was dealing with more of the

2  billing and patient work.

3  Q       Okay.  So the response would have been to create

4  that new position that was different than any position

5  that existed at the time?

6  A        Yes, and it's more pharmacy duties, as far as

7  paperwork of the narcotics or recording of patient

8  medication errors and so forth.  That could have been --

9  that could have all been done on a clerical type of

10  position but of course it was -- it wasn't really

11  incorporated, meaning it wasn't really looked into,

12  researched and approved.

13  Q       Okay.  Now, your complaint says that St. Francis

14  refused to engage in an interactive process to determine

15  reasonable accommodations.  Do you see that?  That's a

16  legal -- interactive process to determine legal

17  accommodations is a legal phrase and I'm sure Mr. Varady

18  and I could talk for hours about what it means.  But I

19  will suggest a lay definition, which is you're alleging

20  that they refused to work with you or talk to you to try

21  to find out, to try to work out ways to accommodate you.

22          Okay.  So with that lay definition are there any

23  instances that you can think of where St. Francis

24  refused to work with you or talk with you to try to find

25  an accommodation that would work for both of you?

1   assisting you in the next couple minutes.

2   Q        Is there anything else that occurred in the

3   admissions area that you believe that you regard as

4   discrimination against you because you had a disability

5   that you haven't told us about?

6   A        Oh, when I did ask for accommodation of learning

7   more my concerns was insurance codes.  Insurance codes

8   when you list it on the patient's information after

9   demographics play an important role in having the

10  hospital receive their reimbursement on a timely basis.

11          And when I was warned by Miss Teresa Pytel that

12  when you make an error and enter that wrong insurance

13  code will prevent -- will cause a delay in the hospital

14  receiving their reimburseement.  And we don't want that

15  to happen.  So when I suggested that I need a little --

16  I need like a book, would you folks allow me to take

17  this book to study, their answer was you won't be able

18  to understand.  Someone has to sit down and explain it

19  to you, you know, on how these procedures are.

20          And when I gave my available time we just didn't

21  have sufficient staffing.  Or comments like, you know,

22  you know, you got to realize, Cara, all of us are

23  clerical people but you, you come from another

24  department that was more technical.  So if you can give

25  us -- if you can give us time, you know, but it's just

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES      185

1    that we don't have enough staffing again.

2            And I did ask for help and I never really was

3    accommodated on that -- on my request to try to improve

4    situations where if money is an issue here, you know,

5    because of insurance codes, if I -- I can give my

6    available time for that specific area.  And I was never

7    given that time.

8            Or even patient care in ER on a rotation basis

9    depending on your shift.  If you're working a certain

10   shift from the morning on a rotation you get sent to ER

11   where you're in that office by yourself and also filling

12   in information as ER patients come in.

13           I was not given enough sufficient time to really

14   handle a situation on an area where you have to be fast.

15   I mean they -- it was a demanding job.  There's like two

16   to three people coming in and you have to be able to

17   make sure that you're fast on the computer.  And then if

18   I'm having problems, you know, if my fingers are

19   constantly getting loss of sensation and I'm trying to

20   ask for help I was not accommodated.

21           Or either if you can't do that position there's

22   something areas that we need to discuss.  But it was

23   never -- it never happened where I would be seated in

24   with the manager, office manager, or that day shift

25   supervisor to accommodate me.  Or at least no

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                186

1   consideration where, okay, you need to let us know if

2   you're going to -- if you're assigned to this department

3   and you're not able to do the computer work on a

4   moderate basis you need to let us know.  I wasn't -- I

5   did not have the opportunity to let them know.  As I

6   said my symptoms had happened unpredictably and it was

7   too late where there was no additional help.

8           So my movements or production would be a little

9   bit more on the slower side where then later another

10  clerk would come in and having to take over.  But it was

11  again not a pleasant situation.  It had caused a lot of

12  areas where statements were made, it was always negative

13  statements, but nothing to accommodate that or nothing

14  to resolve the issues.

15  Q       Did you ever tell Ms. Hashimoto that you wanted

16  to go back up to or to go back to pharmacy?

17  A       I don't recall asking Miss Hashimoto, other than

18  communicating directly with Mr. Alan Itomura from

19  Teamsters.

20  Q       And what did he --

21  A       And he -- and it was his responsibility, in my

22  eyes because we're paying their union dues, we're paying

23  union dues, and to communicate with Miss Hashimoto.

24  That was my belief.

25  Q       And when you went up to the -- if you were to go

1   back to the pharmacy was it your desire to go to that

2   clerical position that you wanted them to create?

3   A        Yes, that was my suggestion to begin with

4   earlier.  And it never happened.

5   Q        So did you realize that you couldn't go to the

6   position that you originally had, so instead wanted to

7   go to a position you wanted them to create, is that

8   correct?

9   A        Yes.

10  Q        Okay.  To your knowledge did they ever create

11  that position?

12  A        No.

13  Q        So I know you don't know today but at least to

14  the best of your knowledge the position was never

15  created?

16  A        No.

17  Q        If you'd look on page 6 at the third claim for

18  relief, paragraph 29, it says "Defendant engaged in

19  unlawful disability discrimination, maintained a hostile

20  work environment and engaged in retaliation prohibited

21  by a Hawaii statute."  Do you see that?

22  A        Yes.

23  Q        What do you mean -- what do you mean when it

24  says -- what do you understand here that it means when

25  it -- terrible question.  Let me start again.  Do you

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                188

1    feel like you were subjected to a hostile work

2    environment?

3    A        Yes.

4    Q        All right.  Why?

5    A        I was actually told, verbally told by other

6    technicians that, you know, they weren't happy, that

7    their position, especially rotating, it was unfair

8    because I had to be accommodated.  And their concerns

9    was what if they were disabled?  Would they be

10   accommodated?  And I -- I could not answer that because

11   I told them, you know, everyone's situation is

12   different.  You know, if I was accommodated I'm pretty

13   sure you would be accommodated in fairness.  But that's

14   all I could answer.

15           But I was totally constantly reminded how bitter

16   they were or, you know, don't mind us for not saying hi

17   to you.  I mean I was really I mean upfront type of

18   situation where in the beginning I told myself, well,

19   you know, I'm not going to allow this to bother me

20   because I'm a different shift.  So I'm just going to

21   tolerate all these comments until the time they leave at

22   4:30.  And I did warn them that if this continues I'm

23   documenting everything and I'm going to have to take

24   this complaint to the union.

25   Q        And did you?

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                                190

1    realizing the qualifications I should have been told

2    before was -- before the selection was made in fairness.

3    To describe fairness why didn't you tell me that these

4    were the requirements when you know that I didn't have

5    this knowledge?  And to have this knowledge would

6    require extensive training but then you don't have the

7    sufficient staff to do it.  That was their answer.  So

8    it was more for accommodation of Americans with

9    Disabilities.

10   Q      So the hostile work environment that you are

11   complaining about was your fellow technicians and the

12   comments they were making?

13   A      Yes.

14   Q      And it's your testimony you did complain to your

15   supervisor about that?

16   A      Yes.

17   Q      All right.  And did anything happen as a result

18   of that?

19   A      Yes.  His suggestion was Cara is going to be

20   working in another department.  So it was -- it was like

21   more a satisfaction for the technicians but not for me.

22   But, as I said, I was selected but not realizing in the

23   future weeks I was also going to be having another

24   hostile type of situation and environment.  Which I did

25   go through also.

COPYING PROHIBITED - HRS 606-13 AND OT.. COURT RULES                191

1    Q          Now when you went down, when you went to

2    admissions, though, you kept your same rate of pay?

3    A          Yes.

4    Q          And you changed from the afternoon shift or

5    evening shift to the day shift?

6    A          Yes, morning.

7    Q          Was that a more desirable shift for you?

8    A          It was a desirable shift because of the clerical

9    duties, you know, a lot of sitting.  And understanding

10   that Miss Teresa Pytel had allowed situations where if

11   you have to stand up and walk around just do that, you

12   know, and just let the person know next to you or

13   whoever's in this room, you know, that room we had like

14   we were like telephone operators.  Just let that person

15   know that you need to stand up for several minutes and

16   walk around if you're having any problems from your

17   waist down.  That was -- she did mention to me and

18   approved that.

19          But, and then again it had caused areas where

20   complaints of -- from the other registrars that, you

21   know, because she can't do this of her disabilities, you

22   know, they felt that it was unfair, too.  And I was also

23   approached with those comments.  And those people that

24   made those comments are not there also.

25   Q          Just to summarize, you did go, you did maintain

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES     194

1    rotate.    Those -- that is one example there.

2         And it's because of you why, you know, part of

3    our responsibilities why we can't achieve our -- or

4    finish during the days because we were taking part of

5    your responsibilities, so when you come in this is why

6    that part of your work was not done.

7         Or if it's like, so if it's something that I'm

8    not able to do because I'm not able to, you know, I'm

9    not risking myself of an injury or I'm not going to risk

10   having this get ruined and damaged so I'm not going to

11   do that.    I mean if I have to get reprimanded for that

12   because of their resentment I will make sure that I am

13   also protected by documenting what was said and then

14   having to again involve our supervisor.    That's my

15   understanding of retaliation.

16   Q         Okay.

17   A         And did you need also any description for

18   admissions, the hostile environment, too?

19   Q         Sure, go ahead.

20   A         I was also approached as, you know, all because,

21   you know, your -- your situation where you're not able

22   to do a certain responsibility, you know, it makes us

23   overloaded with work.    And the thing is did you feel

24   that, you know, maybe this is not your type of position?

25   That person -- that admissions registrar is not there,

1  but those are the type of remarks was also said in

2  admissions, which I feel was like a retaliation.

3        If you cannot do that -- that -- your

4  responsibilities, but we understand it's -- can't be

5  helped because you're disabled then why don't you go and

6  look for another position?  That is my understanding of

7  retaliation.  And if you can't, you know, if I'm not

8  helped the results will be where I'm going to get a

9  lecture from the supervisor.

10 Q        Did you complain to your supervisors about those

11 comments?

12 A        I never had the chance to.

13 Q        What do you mean?

14 A        Because it was never brought up to me.  And if

15 there was an area where I had the opportunity to bring

16 it up to the supervisor or that day shift it was --

17 it -- it was on a day that I was working on a weekend

18 but there was no supervisor until a certain time.  So

19 it -- it never occurred where I had that chance to bring

20 up situations without causing a hostile environment

21 where we all had to gather and say this is -- this is

22 what the issue is.

23        But it never happened.  Because I never had the

24 opportunity due to over workload and possible forgetting

25 to mention it to the supervisor.

CARNAZZO COURT REPORTING SERVICES, INC.  (808) 532-0222

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES          197

1    like in No. II, this word "super seniority" again.  I

2    know you mentioned earlier if I was aware of that word.

3    Or aware of that word "super seniority."  I'm not aware

4    of that word "super seniority."

5    Q          Do you know who put that word in there?

6    A          I can't recall.

7    Q          Let me just ask, is it your understanding that

8    you were given an advantage over other people of equal

9    seniority in bidding for the admissions position?

10   A          My understanding, yes, I was given an advantage

11   to accommodate my disability.

12   Q          But I mean you were given an advantage over

13   other people of the same seniority, is that correct?

14   A          Can you be more detailed when you say of the

15   same seniority?  Because I do recall when I had

16   already started at admissions I was told by two other

17   registrars that my position was awarded to me or I was

18   selected because of disabilities and to accommodate me.

19   And there were other departments -- or two other people

20   that applied for that position who were more qualified

21   than me.  Because they had this clerical background

22   where, for me, these other registrars would have to

23   orientate me and again require more sufficient staffing.

24   Q          All right.  So two other people, you understood

25   that two other people who were more qualified than you

1       MR. VARADY:  But you can confirm that.  Can you

2   confirm that that is an electronic signature.

3       THE WITNESS:  It's an electronic signature.

4   Q       (By Mr. Philpott) And it's an electronic

5   signature that someone else put on this letter?

6   A       Yes.

7   Q       Is there anything in this letter that is not

8   accurate?

9   A       No, it's not inaccurate but it's just the way

10  it's -- the wording.  I'm like, oh, it is -- it is

11  correct my -- the description of my body.

12  Q       Okay.

13  A       That it's failing on me.  But it's symptoms it

14  was just like he described differently.

15      MR. VARADY:  And she has no way of assessing the

16  redacted portion.  I'll just point out there's a portion

17  that's been redacted.

18      MR. PHILPOTT:  All I can tell you is that when

19  the Civil Rights Commission gave it to us they redacted

20  it.  We did not redact anything.  We're just showing you

21  the document they gave us.  So we don't know what's

22  under there.

23          (Deposition Exhibit 26 marked for

24          identification.)

25  Q       (By Mr. Philpott) Let me show you the next

1    document, 26, and this is a fairly lengthy document.

2    And my purpose is just to ask you to confirm that you

3    recognize it, you filled it out and you signed it and so

4    forth.  This is 26.

5    A        (Reviewing.)

6    Q        Let me ask while you're reading, is the

7    handwriting on that document yours?

8    A        Yes.

9    Q        When you're done I'll ask if there's any

10   handwriting on there that isn't yours.  That might be

11   the way to deal with it quickly.

12   A        My own handwriting is unpredictable.  I mean

13   it's hard to understand my own handwriting.

14            MR. VARADY:  The question, Cara, is not to read

15   it but is the handwriting yours?  Not to look at each

16   page.  That's the question that's pending, please.

17            THE WITNESS:  Oh, I'm sorry.  What was your

18   question?

19   Q        (By Mr. Philpott) Is all the handwriting on that

20   document yours?

21   A        Yes.

22   Q        And at the last page is that your signature?

23   A        Yes.

24   Q        And it's dated, you see a date

25   12/20-something/2002?

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                203

1   A        Yes.

2   Q        All right.  And did you sign that document?

3   A        Yes.

4   Q        Okay.  And when you signed it did you understand

5   that you were representing that everything in it was

6   true to the best of your knowledge and belief?

7   A        Yes.

8   Q        And what was the purpose of preparing this

9   document?

10  A        This is an application to the Social Security

11  Administration.

12  Q        All right.  And it was for some -- it was for

13  disability benefits?

14  A        Yes.

15  Q        Okay.  And do I understand that ultimately after

16  several denials that in March of this year Social

17  Security Administration then did grant you benefits?

18  A        I recall meeting face to face with Judge Henry

19  Thai on March 29th, but I was not told at that time.  No

20  decision was made until I -- two months later.  So I was

21  not notified of anything during that month.

22  Q        All right.  But some time thereafter you were

23  notified that your application for benefits was granted?

24  A        Their description was favorable.  Because it's

25  also -- also to the committee that makes the decision

1    incident that needs to be addressed you need to let us

2    know.  And I did let them know.

3        Although they may have documented it in the past

4    that I did not let them know.  And I did.  Because if I

5    didn't why was I faced with a lot of resentment and

6    registrars just telling me straight to my face that, who

7    are no longer there, that I should be really thinking

8    about possibly applying for another position that is not

9    so overwhelming.  And they did tell me that this

10   position is overwhelming.  And I understood that.  I

11   know that it's overwhelming.

12       But the fact is if I have proper training I know

13   I can do the job.  But you have to understand that I

14   come from another position that was more technical, more

15   on the floors delivering, or repairing, filling meds,

16   and it was not mainly understanding insurance codes or

17   all these different codes of the requirements of an

18   admissions registrar.  That's the difference.

19   Q       What is your understanding as to why you were

20   placed on vacation from the admissions position?

21   A       Okay.  My understanding, as I've mentioned

22   again, was because I did not fulfill requirements of

23   admissions of St. Francis Liliha regarding mainly

24   insurance codes that dealt with serious reimbursements

25   on a timely basis.  And also other duties as far as

1   being able to do the telephone operating work to call

2   and remind patients or update their demographics.

3        Those are one of the areas that was addressed

4   where there were incidents where I was all right and all

5   of a sudden if my right side had just suddenly attacked

6   me, those are things where it did produce resentment.

7   Because it, in the eyes of those registrars they felt it

8   was a simple task. But it's not simple if you're the

9   one with that disability. It's not a simple task if

10  you're the one afflicted with that. But it's okay for

11  you to comment on that. See, there's a difference.

12       And I, like I told them I can't -- I have no

13  control if it attacks me. I'm letting you know now but

14  don't get angry at me. I've had situations where

15  registrars would really become upset over that. And

16  they didn't have to tell me but it's their actions.

17  Q        Was it your belief that you had not been

18  provided with adequate training?

19  A        In admissions?

20  Q        Yes.

21  A        My understanding, yes.

22  Q        If you had been provided with adequate training

23  do you believe you could have done the job?

24  A        Yes, I believe I could have done the job. And

25  also at the same time with consideration that should I

COPYING PROHIBITED - HRS 606-13 AND OTHER COURT RULES                215

1   have that symptom at that time to let them know

2   immediately so that way in case there's something that

3   I'm with a patient updating demographics and I'm not --

4   unable to receive that information, my results would be

5   to say let the patient know that I will call them in

6   couple minutes.  There's a -- there's a situation where

7   it needs to be addressed.  And thank them for their

8   understanding.

9         Those are things where I had to, like I said,

10  modify or prioritize.  But, as I said, it wasn't, I

11  guess for other registrars their understanding to really

12  understand a person with disability or any type of

13  disability.

14  Q    So do you believe that your disability may

15  impair your ability to do the job in the registrar's

16  job?

17        MR. VARADY:  Objection as to the term impair is

18  vague.

19        THE WITNESS:  I'm sorry, can you repeat your

20  question?

21  Q    (By Mr. Philpott) Sure.  Do you believe that

22  your disability interfered with your ability to do your

23  job in the admissions department?

24  A    Yes, I believe when it really happened.

25  Q    By that you mean when you had symptoms?