# EXHIBIT I

 **SOCIAL SECURITY ADMINISTRATION**

Refer To: 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

Office of Hearings and Appeals
SSA/OHA Hearing Office
Room 3-303
300 Ala Moana Blvd
Box 50066
Honolulu, HI 96850

Date:  June 20, 2005

Cara L. Loeser
5122 Likini St., #307
Honolulu, HI 96818

## NOTICE OF DECISION – FULLY FAVORABLE

I have made the enclosed decision in your case.  Please read this notice and the decision carefully.

### This Decision is Fully Favorable To You

Another office will process the decision and send you a letter about your benefits.  Your local Social Security office or another may first ask you for more information.  If you do not hear anything for 60 days, contact your local office.

### The Appeals Council May Review The Decision On Its Own

The Appeals Council may decide to review my decision even though you do not ask it to do so.  To do that, the Council must mail you a notice about its review within 60 days from the date shown above.  Review at the Council's own motion could make the decision less favorable or unfavorable to you.

### If You Disagree With The Decision

If you believe my decision is not fully favorable to you, or if you disagree with it for any reason, you may file an appeal with the Appeals Council.

### How To File An Appeal

To file an appeal you or your representative must request the Appeals Council to review the decision.  You must make the request in writing.  You may use our Request for Review form, HA-520, or write a letter.

You may file your request at any local Social Security office or a hearing office.  You may also mail your request right to the **Appeals Council, Office of Hearings and Appeals, 5107 Leesburg Pike, Falls Church, VA 22041-3255**.  Please put the Social Security number shown above on any appeal you file.

See Next Page

**EXHIBIT I**

Cara L. Loeser (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)                                Page 2 of 3

**Time To File An Appeal**

> To file an appeal, you must file your request for review **within 60 days** from the date you get this notice.

> The Appeals Council assumes you got the notice 5 days after the date shown above unless you show you did not get it within the 5-day period. The Council will dismiss a late request unless you show you had a good reason for not filing it on time.

**Time To Submit New Evidence**

> You should submit any new evidence you wish to the Appeals Council to consider **with** your request for review.

**How An Appeal Works**

> Our regulations state the rules the Appeals Council applies to decide when and how to review a case. These rules appear in the Code of Federal Regulations, Title 20, Chapter III, Part 404 (Subpart J) and Part 416 (Subpart N).

> If you file an appeal, the Council will consider all of my decision, even the parts with which you agree. The Council may review your case for any reason. It **will** review your case if one of the reasons for review listed in our regulations exists. Section 404.970 and 416.1470 of the regulation list these reasons.

> Requesting review places the entire record of your case before the Council. Review can make any part of my decision more or less favorable or unfavorable to you.

> On review, the Council may itself consider the issues and decide your case. The Council may also send it back to an Administrative Law Judge for a new decision.

**If No Appeal And No Appeals Council Review**

> If you do not appeal and the Council does not review my decision on its own motion, you will not have a right to court review. My decision will be a final decision that can be changed only under special rules.

See Next Page

P2.000005

Cara L. Loeser (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)                                    Page 3 of 3

**If You Have Any Questions**

   If you have any questions, you may call, write or visit any Social Security office. If you visit
an office, please bring this notice and decision with you. The telephone number of the local
office that serves your area is (808)541-3600. Its address is 300 Ala Moana Blvd, Rm 1-114,
Honolulu, HI 96850.

Henry M. Tai
Administrative Law Judge
Honolulu, Hawaii Hearing Office

cc:  Dina W. Rogers
     ASB Tower
     1001 Bishop St., #2870
     Honolulu, HI 96813

P2.000006

**SOCIAL SECURITY ADMINISTRATION**
**Office of Hearings and Appeals**

**DECISION**

<u>**IN THE CASE OF**</u>

<u>**CLAIM FOR**</u>

Period of Disability,
Disability Insurance Benefits, and
Supplemental Security Income

Cara L. Loeser
(Claimant)

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
(Wage Earner)

(Social Security Number)

<u>**INTRODUCTION**</u>

On December 19, 2002, the claimant filed applications for Disability Insurance Benefits and Supplemental Security Income payments (protective filing date). Both claims were denied initially and on reconsideration, and a request for hearing was timely filed on February 23, 2004. The claimant personally appeared and testified at a hearing that was subsequently held on March 29, 2005 in Honolulu, Hawaii. The claimant alleges disability beginning July 31, 2001 due to multiple sclerosis. Dina W. Rogers, a non-attorney, represents the claimant in this matter. Also testifying was Betty Sestak, a vocational expert.

The general issue is whether the claimant is entitled to a period of disability and Disability Insurance Benefits under sections 216(i) and 223 of the Social Security Act, and whether she is disabled under section 1614(a)(3)(A) of the Social Security Act. The specific issue is whether she is under a disability, which is defined as the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death or that has lasted or can be expected to last for a continuous period of not less than 12 months.

With respect to the claim for Disability Insurance Benefits, there is an additional issue pertaining to insured status. A review of the claimant's earnings record reveals that she has earned sufficient quarters of coverage to remain insured at least through the date of this decision.

See Next Page

Cara L. Loeser (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)                                        Page 2 of 8

## EVALUATION OF THE EVIDENCE

After a thorough evaluation of the entire record, it is concluded that the claimant has been disabled since July 31, 2001. The claimant is a 50-year-old individual with a high school education and past relevant work that includes work as a pharmacy technician and cashier. After the date of alleged onset of disability, the claimant began working as an aqua fitness instructor. She testified that she teaches a one-hour class twice a week. The undersigned finds that the claimant has not engaged in substantial gainful activity at any time since the alleged onset date.

The claimant has the following impairment, which is considered to be "severe" under the Social Security Act and Regulations: multiple sclerosis. She has also been given a diagnosis of an adjustment disorder, with a depressed mood. Her impairments do not meet or equal the criteria of any listed impairment described in Appendix 1 of the Regulations (20 CFR, Part 404, Subpart P, Appendix 1). No treating or examining physician has mentioned findings that would satisfy or be equivalent to the requirements of any listed impairment. At the request of the undersigned, Dr. John Wagner, an internist, agreed to act as an expert in this case. After reviewing the record, Dr. Wagner opined that the claimant did not have medical impairment that met or equaled the Listing of Impairments (Exhibit 21F). The undersigned affords some weight to Dr. Wagner's opinion, but is not entirely persuaded by Dr. Wagner's opinion because his findings were primarily limited to whether the claimant met or equaled the Listing of Impairments. Furthermore, Dr. Wagner did not have the opportunity to review evidence subsequently submitted. [SSR 96-6p] A determination must therefore be made of whether the claimant retains the residual functional capacity to perform the requirements of her past relevant work or can adjust to other work.

At the hearing the claimant testified that over time her condition has worsened. Her ability to perform basic work activities, including sitting, standing, and walking have diminished. She stated that she is able to walk for about five to ten minutes with rest breaks and with the assistance of a cane. After sitting for 20 minutes she requires assistance rising from the seated position. Her ability to lift/carry objects is limited to no more than five pounds. The claimant reported that she is frequently unaware that she has dropped items she is holding. She requires frequent rest periods and spends much of her time lying down. She also has recurrent problems with her vision and incontinence. In written statements and/or by further testimony at the hearing, she indicated that she requires assistance with bathing and dressing herself. Household chores are limited to perhaps wiping a counter. She does not cook, drive, or shop for groceries. She is dependent on others to attend to most of the household chores (Exhibits 2E, 4E, 6E, and 12E). The claimant's statements and testimony at the hearing are credible based on the medical evidence in the record, as follows. [SSR 96-7p]

The claimant has a history of multiple sclerosis as documented by multiple MRI studies of the brain. She complained of numbness and heaviness on the right side of her body, particularly in her right upper extremity, with pain in her elbow. According to Dr. David Kaku, a neurologist, the claimant had difficulty controlling her right arm to engage in activities such as writing. The claimant noticed similar problems with her left arm but on a less frequent basis. Clinical notes indicated that the claimant's condition was treated with Avonex therapy. Initially, Dr. Kaku recommended that the claimant limit her activity to less exertional tasks such as those that might

See Next Page

be performed while sitting. Due to increased symptoms, including numbness and weakness in the lower extremities, the claimant was started on the use of Neurontin. However, due to the progressive nature of the claimant's condition, Dr. Kaku later stated that the claimant had functional limitations on her ability to engage in work activities such as prolonged standing and walking, lifting, carrying and climbing due to numbness, weakness, and paresthesia in her legs and face. Dr. Kaku also noted that the claimant was experiencing episodes during which she had difficulty responding to others, which were not typical of multiple sclerosis attacks but that would impair the claimant's ability to interact with others, concentrate and think (Exhibits 1F-2F, 4F, and 12F).

Due to increased difficulty walking and an unsteady gait, the claimant had to hold onto the wall and walked very cautiously. Joint position sensation was absent at the right toes and fingers. Although she could feel the movement of her left toes and fingers, the claimant was uncertain about the direction. Sensitivity to cold temperatures was diminished at the right arm, trunk, and leg. Dr. Kaku thought that the claimant's walking problems might be reflective of loss of proprioception from a dorsal column spinal cord lesion. Evaluative studies performed in June 2003 revealed evidence of a possible thoracic spinal cord arteriovenous malformation or arteriovenous fistula. The claimant also underwent urodynamic evaluation as she began to have decreased sensation of her bladder and was unaware when she was full. Adjustments were made to the claimant's medication regimen due to various side effects. The claimant reported tingling in all of her extremities and pain and weakness from her waist down (Exhibits 10F-12F and 14F).

By report dated January 2004, Dr. Kaku stated that the claimant could stand for no more than one hour due to pain from her hips to legs, and numbness and needle sensations in the feet. Sitting continuously for more than 20 minutes would cause the claimant to experience the needle sensation in her feet, and heaviness in her shoulder and neck. Within an eight-hour workday, she would require two rest periods of at least one-half hour duration each. Additionally, the claimant was noted to have bladder dysfunction resulting in urinary frequency and incontinence that requires timed voids. Side effects from prescribed medication include impaired ability to concentrate and memory problems. On occasion, she requires assistance with walking. As indicated earlier in this decision, the claimant was also described as having episodes of being unaware of her surroundings and being non-responsive to others. Dr. Kaku opined that the frequency of the claimant's symptoms would prevent her from maintaining employment (Exhibit 19F).

The claimant was also referred to Dr. M. Pierre Pang for evaluation of vision difficulties. The claimant saw black spots and flashing lights; and, experienced transient loss of central and peripheral vision. Based on his examination of the claimant, Dr. Pang stated that the claimant's fluctuating vision might be secondary to her multiple sclerosis. The claimant was advised to return if her symptoms increased. Otherwise, annual eye examinations were recommended (Exhibit 22F).

According to Dr. Leo Maher, a treating physician, the claimant's prognosis was "poor" with symptoms of fatigue; balance problems; poor coordination; weakness; difficulty remembering; emotional lability; increased muscle tension; sensitivity to heat; bowel problems; numbness,

P2.000009

tingling or other sensory disturbance; problems with judgment; confusion; double or blurred vision; loss of manual dexterity; unstable walking; pain; depression; and, speech/communication difficulties. The claimant had significant and persistent disorganization of motor function such that she was unable to ambulate 10 feet without assistance. Dr. Maher further stated that the claimant was able to sit for only 10 minutes at one time and stand for only 10 minutes at one time. In an eight-hour work day, Dr. Maher opined that the claimant would be able to sit for less than two hours total and stand/walk less than two hours total. Frequent position changes and rest periods would be necessary and the claimant would require the use of a cane for assistance with standing and walking. The claimant might be able to lift/carry objects weighing less than ten pounds. She would be precluded from twisting, stooping, crouching, and climbing stairs/ladders. In addition the claimant would lack the capacity to perform fine manipulative tasks bilaterally. Dr. Maher concluded that the claimant's condition would cause the claimant to be absent from work more than four days per month (Exhibit 25F).

After reviewing the record, the undersigned assigns greater weight to the opinions of Drs. Maher and Kaku, as they are based on actual examination of the claimant and are supported by clinical findings and objective studies. Limited weight is afforded to the opinion of the Agency medical consultant, who after reviewing the file at the reconsideration level, made an assessment without benefit of actual examination, the written evidence submitted after the determination was made, and the hearing testimony. [SSR 96-2p and 96-6p]

The medical record also shows that the claimant developed a depressed mood, insomnia, lack of energy/motivation, and suicidal thoughts following her termination from work in 2001. According to Dr. Dan-Hideki Tanahashi, the claimant was withdrawn and socially isolated. Although medication was recommended, the claimant declined such prescriptions in August 2001 but agreed to call for another appointment. However, Dr. Tanahashi did not indicate that the claimant was seen again (Exhibits 3F and 18F).

In March 2003 Dr. Stephen Kemble began seeing the claimant for psychiatric care. Dr. Kemble offered a diagnosis of an adjustment disorder with a depressed mood due to the claimant's difficulty accepting her medical condition. Dr. Kemble noted that the claimant had attempted a suicidal gesture in October 2002. The claimant was described as having a tendency to ramble and displaying difficulty getting to the point. However, her thoughts were not bizarre or psychotic. The claimant admitted that she was sometimes sad and worried, but not severely depressed. No medications were prescribed but the claimant was started on bi-weekly therapy sessions. Dr. Kemble opined that the claimant's ability to adapt and cope was deteriorating as her medical condition progressed with the onset of new symptoms, including vision and cognitive problems. According to Dr. Kemble, the claimant had "lots of ideas and plans, but isn't getting much done." The claimant was given a trial of Effexor, which she stopped of her own accord because she did not want to be on medication and instead was trying to increase her activities and lift her self-esteem. However, Dr. Kemble prepared a letter in January 2004 in support of the claimant's application for disability benefits due to multiple sclerosis (Exhibits 6F, 13F, and 20F).

In December 2003 Dr. James T. Greene saw the claimant during a psychological consultative evaluation. In addition to multiple sclerosis related symptoms, the claimant presented with

See Next Page

primary complaints of frustration and depression, relative to her physical limitations. The claimant was described as a bit preoccupied and mildly depressed, with some frustration and irritability. However, Dr. Greene opined that there was noting to suggest any chronic psychiatric disorder. Standardized psychological test results showed that the claimant was in the average range of applied intelligence. There was some evidence to suggest a developing weakness in cognitive functioning related to the claimant's multiple sclerosis. Dr. Greene agreed with Dr. Kemble's diagnosis of an adjustment disorder, depressed, relative to difficulties with work and dealing with the claimant's illness. Dr. Greene further opined that the claimant was psychiatrically capable of competitive employment and that any basis for disability would need to be made strictly on a medical/physical basis (Exhibit 15F).

Due to the progressive nature of the claimant's multiple sclerosis, Dr. Kemble stated that the claimant was having problems with focusing and her mind wandering. The claimant worried about future health care and management of her finances. Although currently competent, Dr. Kemble agreed that the claimant might need assistance in the not too distant future. The medical record indicates that the claimant sought emergent care in December 2004 due to signs of "confusion." It appears that the claimant briefly lost control of her vocal cords. She was advised to make an appointment with Dr. Kemble in an attempt to identify the cause of this symptom (Exhibits 23F and 24F).

After careful consideration of the record, the undersigned finds that the claimant does not have significant psychiatric restrictions on her activities of daily living, social functioning, and concentration. Dr. Greene agreed with the assessment of treating psychiatrist, Dr. Kemble, who stated that the claimant was psychiatrically capable of competitive employment. The undersigned is persuaded by the findings of Drs. Kemble and Greene, who after careful consideration, set forth well-reasoned opinions based on actual examination of the claimant. Their opinions are thus entitled to great weight. Consistent with these opinions, the Agency mental health consultant, who reviewed the record at the reconsideration level, made a determination that the claimant did not have a severe psychiatric impairment. Great weight is also afforded this opinion. [SSR 96-2p and 96-6p]

The evidence in its entirety supports a finding that the claimant retains the residual functional capacity to sit for no longer than ten minutes at one time and stand/walk no more than ten minutes at one time. Within an eight-hour work day, the claimant would be able to sit for less than two hours total and stand/ walk less than two hours total. Frequent position changes and rest periods would be necessary and she would require the use of a cane for assistance with standing and walking. The claimant might be able to lift/carry objects weighing less than ten pounds. She would be precluded from twisting, stooping, crouching, and climbing stairs/ladders. In addition, the claimant would lack the capacity to perform fine manipulative tasks bilaterally. Her condition would cause the claimant to be absent from work more than four days per month.

Thus, the record as a whole persuasively demonstrates that the claimant experiences pain, fatigue, and other symptoms of such intensity, persistence, and with such limiting effect that it restricts the claimant from doing any type of work, even sedentary work. As defined by the Social Security Regulations, sedentary work is generally performed while sitting, although some

See Next Page

Cara L. Loeser (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)                                                    Page 6 of 8

walking and standing is involved.  It does not require lifting more than ten pounds (20 CFR
§404.1567 and 416.967).

As the claimant has demonstrated that she lacks the residual functional capacity to perform the
requirements of any past relevant work, the burden shifts to the Social Security Administration to
show that there are other jobs existing in significant numbers in the national economy which the
claimant can perform, consistent with her medically determinable impairments, functional
limitations, age, education and work experience.  This determination is made in conjunction with
the Medical-Vocational guidelines of Appendix 2 of Subpart P of the regulations
(20 CFR Part 404).  Appendix 2 contains a series of rules that direct a conclusion of either
"disabled" or "not disabled" depending upon the claimant's age, education, work experience, and
residual functional capacity.

Born January 20, 1955, the claimant was 46 years old, a younger individual, on July 31, 2001.
She is currently 50 years old, which is considered to be closely approaching advanced age.  She
has a high school education and has a semi-skilled work background.

As the claimant has significant non-exertional limitations, strict application of the Medical-
Vocational Rules is not possible.  The vocational expert testified that given an individual with
the claimant's residual functional capacity, and the vocational factors of her age, education and
past relevant work experience, there are no jobs existing in significant numbers that such an
individual would be capable of performing.

In accordance with a finding that the claimant has been under a disability beginning
July 31, 2001, she is entitled to Disability Insurance Benefits on the basis of her application of
December 19, 2002 and eligible for Supplemental Security Income payments by virtue of her
application of December 19, 2002.

Pursuant to section 1631(a)(2), payment must be made to a representative payee if the claimant is
incapable of handling benefits on his own.  A representative payee is not necessary in this case
given the evidence in the record.

## FINDINGS

After careful consideration of the entire record, the Administrative Law Judge makes the
following findings:

1.    The claimant meets the nondisability requirements for a period of disability and Disability
      Insurance Benefits set forth in Section 216(i) of the Social Security Act and is insured for
      benefits as of the established onset date.

2.    The claimant has not engaged in substantial gainful activity since July 31, 2001.

See Next Page

P2.000012

3. The medical evidence establishes that the claimant has the following "severe" impairment: multiple sclerosis. She has also been given a diagnosis of an adjustment disorder, with a depressed mood.

4. The claimant has no impairment that meets or equals the criteria of any impairment listed in Appendix 1, Subpart P, Regulations No. 4.

5. The claimant's assertions concerning her ability to work are credible.

6. The claimant retains the residual functional capacity to sit for no longer than ten minutes at one time and stand/walk no more than ten minutes at one time. Within an eight-hour work day, the claimant would be able to sit for less than two hours total and stand/ walk less than two hours total. Frequent position changes and rest periods would be necessary and she would require the use of a cane for assistance with standing and walking. The claimant might be able to lift/carry objects weighing less than ten pounds. She would be precluded from twisting, stooping, crouching, and climbing stairs/ladders. In addition, the claimant would lack the capacity to perform fine manipulative tasks bilaterally. Her condition would cause the claimant to be absent from work more than four days per month.

7. The claimant is unable to perform the requirements of her past relevant work.

8. The claimant's residual functional capacity for the full range of sedentary work is reduced by additional limitations.

9. On July 31, 2001, the claimant was a younger individual age 45-49. She is currently 50 years old, which is considered to be closely approaching advanced age.

10. The claimant has a high school education.

11. The claimant has a semi-skilled work background.

12. Considering the claimant's additional limitations, she cannot make an adjustment to any work that exists in significant numbers in the economy according to the vocational expert testimony.

13. The claimant has been under a disability, as defined in the Social Security Act, since July 31, 2001 (20 CFR §§404.1520(g) and 416.920(g)).

## DECISION

It is the decision of the Administrative Law Judge that, based on the application protectively filed on December 19, 2002, the claimant is entitled to a period of disability commencing July 31, 2001 and to Disability Insurance Benefits under sections 216(i) and 223, respectively, of the Social Security Act.

See Next Page

Cara L. Loeser (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)                                    Page 8 of 8

It is the further decision of the Administrative Law Judge that, based on the application filed on December 19, 2002, the claimant was disabled under section 1614(a)(3)(A) of the Social Security Act, beginning July 31, 2001, and that the claimant's disability has continued at least through the date of this decision.

Under section 1611(c)(7) of the Social Security Act, payments for Supplemental Security Income may only begin on the application effect date, that is, the first day of the month following the later of: (1) the date the application is filed; or, (2) the date the person first meets all eligibility factors.

The component of the Social Security Administration responsible for authorizing Supplemental Security Income payments will advise the claimant regarding the nondisability requirements for these payments, and if eligible, the amount and the months for which payment will be made.

Henry M. Tai
Administrative Law Judge
Honolulu, Hawaii Hearing Office

June 20, 2005
Date

P2.000014