LAW OFFICES OF CARL M. VARADY

CARL M. VARADY  4873
American Savings Bank Tower
1001 Bishop Street, Suite 2870
Honolulu, Hawai'i 96813
Telephone (808) 523-8447

Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CARA LOESER<br><br>Plaintiff,<br><br>vs.<br><br>ST. FRANCIS MEDICAL CENTER<br><br>Defendant. | CV 04-00474 (DAE/KSC)<br><br>ERRATA TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ST. FRANCIS MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT [DECLARATION OF CARA LOESER]; CERTIFICATE OF SERVICE<br><br>Date: March 20, 2006<br>Time: 9:45 a.m.<br>Hon. David A. Ezra |

**ERRATA TO PLAINTIFF'S MEMORANDUM IN OPPOSITION TO DEFENDANT ST. FRANCIS MEDICAL CENTER'S MOTION FOR SUMMARY JUDGMENT [DECLARATION OF CARA LOESER]**

Plaintiff Cara Loeser hereby submits the attached Errata to Plaintiff's Memorandum in Opposition to Defendant St. Francis Medical Center's Motion for Summary Judgment [Declaration of Cara Loeser], bearing the original signature of Cara Loeser.

DATED: Honolulu, Hawai'i, March 8, 2006.

                                        /s/
                                      CARL M. VARADY
                                      Attorney for Plaintiff
                                      CARA LOESER

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| CARA LOESER<br><br>    Plaintiff,<br><br>vs.<br><br>ST. FRANCIS MEDICAL CENTER<br><br>    Defendant. | CV 04-00474 (DAE/KSC)<br><br>DECLARATION OF CARA LOESER |

## DECLARATION OF CARA LOESER

CARAL LOESER, declares:

1. I am the plaintiff in this matter, am above the age of 18 years old and make this declaration of my own personal knowledge.

2. I have been diagnosed with multiple sclerosis (hereafter "MS") since October 1998, and now am receiving disability benefits from the Social Security Administration.

3. I was employed as a pharmacy technician at St. Francis Medical Center until December 2000. In that position, my duties included retrieving prescriptions from drugs stored in the hospital pharmacy and preparing them for delivery to patients in a variety of circumstances. In every instance in which I

made such retrievals, however, it was mandatory that these selections be reviewed and approved by a pharmacist before they were distributed to patients. The prescriptions I selected were those on written orders provided to me. Prescriptions selected by me from the hospital pharmacy would not be provided to any patient without first being subjected to this review and approval process, which was mandated by law and designed to prevent patients from receiving the wrong prescription.

    4.    I have experienced symptoms of numbness, weakness, dizziness sensory loss and other problems and described in the years since my initial diagnosis in 1998. However, at the time I was terminated from the Pharmacy Technician's position, my principal symptom for which I sought accommodation was a loss of strength that made it difficult for me to lift heavy objects and, in particular, push the pharmacy cart onto which prescriptions ordinarily were loaded. To deal with this problem I requested accommodation in the form of a lighter cart, light duty work, in the form of clerical or computer work in the pharmacy, or help pushing the cart to address my loss of strength and stamina resulting from <u>my</u> MS. During my employment in the pharmacy, I was personally aware of other individuals who received accommodation for disabling conditions that interfered with their ability to perform work. For example, Nelia Delos Santos was given assistance with the pharmacy cart because of her back injury and limitations on her range of motion,

strength and stamina.  In fact, other technicians who were not disabled, complained of and received assistance with the cart when it was too heavy.  I am personally aware of this through my role as a the union representative in the pharmacy during my employment there.

      5.    I was required to push the pharmacy cart when it weighed more than 20 pounds without assistance.  This slowed me down and prohibited me from completing tasks within the time assigned.  Had I been assigned to strictly clerical work or stock-pulling in the pharmacy, rather than delivery assignments, all of which were within the scope of my job duties as a pharmacy technician, I could have continued working in the pharmacy.  Cart deliveries, when the cart was heavy, could have been assisted with the assistance of a transporter, but this assistance was not offered me, even though these transporters assisted other pharmacy technicians.

      6.    Like all pharmacy technicians, Defendant mandated that I submit all prescribed substances and the prescription slip to the pharmacist on duty before the prescription was provided to any patient.  Like all other pharmacy technicians, I occasionally made a mistake in selection.  No patients were given the wrong prescription as a result of such selections as they all were mandatorily reviewed by pharmacists before being distributed to patients.

      7.    While I could not fully control my symptoms, they did not

contribute to the safety or accuracy with which I filled prescriptions. My speed was affected only insofar as I was required to push a heavy cart and make deliveries to patient floors, rather than accommodating my request for alternatives, such a pulling stock or doing clerical and computer work.

        8. I could not predict when I would have a good or bad day, but that the onset of _my_ symptoms was not the primary cause of my need for accommodation, which was a routine need not to be assigned deliveries using the heavy pharmacy cart, making work much more difficult and causing delays in my other assignments, such as stock-pulling and clerical and computer work. The difficulty in work was caused by my employer's refusal to provide me with reasonable accommodation in the form of modified assignments or assistance in with the heavy pharmacy cart.

        9. As indicated at page 56 of my deposition, I did not testify that I was completely unable to move, but that there were times when I could not move _my_ arm or could not type or required assistance from the pharmacist.

        10. While I was told the equipment cost "more than a thousand dollars," but I have no independent knowledge that this is true.

        11. My specific symptoms from MS were unpredictable in their onset. The fact that I had MS and the resulting symptoms and their unpredictable onset were known to St. Francis, as I frequently informed my supervisors of these

problems. By use of the word "judgment," in my deposition was referring to problems in vision that affected <u>my</u> ability to judge depth and space.

12. I experienced a hostile work environment due to the problems associated with my disability and my requests for assistance and accommodation. In the pharmacy, staff was often short-handed on the shift I was assigned to and requests for limited duty by me were viewed as an imposition of management and other staff. When I moved to Admissions, I experienced similar hostility, with co-workers also expressing the fear that my MS was contagious like HIV disease. I was not given proper training during my probationary period in Admissions as a result of such hostility and suspicion. My co-workers did not want to make adjustments in their schedules or duties that would have permitted me to perform my job function with reasonable accommodation.

13. I only chose to bid on a position in Admissions after my repeated requests for light-duty and other permanent accommodations in the pharmacy were refused by St. Francis. I would not have made this application if I had been offered the accommodations I and requested. If such accommodation had been provided, I would have continued to work in the pharmacy, rather than having to bid on and take a probationary position in an area where I had not training or experience.

14. During my work in the pharmacy and Admissions, I would

recognize documents and understand where they came from, even though had momentary gaps in memory. In terms of my work performance, this meant that I sometimes needed additional time to complete tasks, and would keep a written record of tasks that were interrupted or delayed by such momentary gaps in memory.

15. The problems I experienced with disorientation and memory also were momentary, were not constant and were not of a sufficient duration to prevent me from doing my job with reasonable accommodation in the form of additional time, or assignment to work in the pharmacy that did not require an emergency response, which work was available in the from of stock-pulling and clerical and computer work. Similarly, Admissions work was not emergency work and reasonable accommodation in the form of additional time could have been provided without seriously impacting the work.

16. In my deposition, I testified only that, occasionally, I wanted to be able to call a patient back if I was having difficulty recording demographic information during the admission process.

17. As I explained above, I asked for accommodation many times, both while working in the pharmacy and then when training in Admissions. I was not able to predict every instance in which my symptoms would become severe, but all employees at St. Francis are eligible for sick leave, which I would have requested

if I was unable to work for an extended period. Furthermore, minor delays occur in every employee's work life at St. Francis and, for minor episodes of symptoms related to my MS, I was seeking only short delays or assignment to work where such delays would not be a problem. My requests were denied. Instead, I was forced to bid on a job in Admissions and accept a 90-day probationary period. I was not properly trained, experienced a hostile and retaliatory work environment and, ultimately, was terminated for failing to perform work for which I was not adequately trained.

        18.    I testified that I was not given adequate training during my probationary period in Admissions, that I did not want to work in that department and did not seek a position there voluntarily. I was not trained properly due to the hostility of my co-workers and supervisors who were openly hostile to my requests for additional assistance in learning the job, more time to perform tasks and conducted a whispering campaign that my MS was contagious like HIV. I was ostracized by my co-workers and denied the training and support that would have permitted me to learn and successfully train in the complex position of admissions registrar. This position required that I learn complex codes and an information database with which I was not familiar. I could not succeed with proper training and support, which were denied me as a result of retaliation for my requested accommodation.

-7-

19. My supervisors were witnesses to the hostility directed at me by my co-worker's, who, in addition to fearing that MS was contagious, resented what they thought was additional work they had to do during my probationary period in Admissions, or when I was seeking limitations on my duties in the pharmacy. This hostility took the form of rude comments about the amount of work other employees were doing compared to me and about the speed with which I was learning my job duties in Admissions.

20. I was not provided with reasonable accommodation that would have permitted me to continue in _my_ position as an admissions registrar, and, in particular, was not given sufficient time to train during my probationary period or support as I attempted to retrain in an area in which I was not familiar. The open hostility with which I was met by my co-workers made the training even more stressful and magnified the difficulties I was experiencing. I would have been able to learn the job and perform the job function if I had been provided appropriate training, which was withheld, and been protected from such hostile and retaliatory behavior by my co-workers who resented my requests for accommodation and did not believe I should be given supports, including additional time, in which to learn and perform the job.

21. I was not offered nor given the opportunity to perform the Patient Account Processor position as the detailed technical training required for

this position was never provided to me.

22.  I was willing to return to the pharmacy, but was told by my supervisors that I could not do so because of my limitations. I did not ask to return to this position after being told it was not available to me.

23.  Although I was told that a personal assistant would have been a hardship on St. Francis, I have no knowledge as to whether what I requested, a transporter to help me push the pharmacy cart or do heavy lifting, would constitute an unreasonable hardship on St. Francis.

24.  After being terminated by St. Francis, I have continued to seek employment. As my MS becomes progressively worse, I have found it more and more difficult to work and have been terminated from other positions. I currently work as a part-time *Pilates* fitness instructor at the YWCA.

25.  As described above, both in the pharmacy technicians position and, after being forced to apply for the admission registrar's position, I requested accommodations that would have permitted me to work, without unreasonable hardship on the part of my employer. These requests included, without limitation: of additional time, or assignment to work in the pharmacy that did not require an emergency response, which work was available in the from of stock-pulling and clerical and computer work. Similarly, in Admissions, the work I trained for was not emergency work and reasonable accommodation in the form of additional time

for training me could have been provided without seriously impacting the work.

      26.   In 2000, Mr. Oba, the acting pharmacy director, discussed with me and Mr. Bruno, my union representative, creating a clerical position for me in the pharmacy, before I left the pharmacy, but the position was never created. Instead, I was forced to apply for work in the Admissions Department. I was placed on 90-days probation and a number of criteria were applied to my work performance that would not otherwise apply to other employees.

      27.   During the probationary period in Admissions, my co-workers discussed my condition, shunned me, were hostile, complained that they had to do more work than I and, I discovered, considered my MS contagious like HIV disease. This hostile environment directly interfered with my ability to complete the 90-day probationary period successfully.

      28.   During the probationary period in Admissions, I was subjected to greater scrutiny than other non-disabled workers and training and accommodation necessary for me to perform <u>my</u> job duties, including necessary information to complete patient registration was denied me, even though I offered to work overtime to accomplish my training and perform my assignments.

DATED: Honolulu, Hawai'i, March __2__, 2006.

                                                     CARA LOESER

I hereby certify that, on the date and by the method of service noted below, a correct copy of the foregoing was served on the following at their last know addresses:

Notice will be electronically mailed to:

Liann Y. Ebesugawa lebesugawa@goodsill.com, mnakagawa@goodsill.com; dmartian@goodsill.com

Carolyn K. Gugelyk cgugelyk@goodsill.com, dmartian@goodsill.com; mnakagawa@goodsill.com

A. Richard Philpott rphilpott@goodsill.com, nfarris@goodsill.com

DATE: March 8, 2006.

                                               /S/

                                               CARL M. VARADY

                                               Attorney for Plaintiff